# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PAUL F. WEINBAUM,     )
           )
   Plaintiff,     )
           )
vs.           )    NO. CV 03-1043 RB/LAM
           )
LAS CRUCES PUBLIC SCHOOLS, )
CHARLES DAVIS, LEONEL BRISENO, )
GENE GANT, JOHN SCHWEBKE, )
SHARON WOODEN, as School Board Members )
of Las Cruces Public Schools,  )
           )
   Defendants.    )

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the parties' cross motions for summary judgment (Docs. 32, 38). Jurisdiction arises under 28 U.S.C. § 1331 (2000) and 42 U.S.C. § 1983 (2000).

This case concerns whether - in Las Cruces, New Mexico - the Establishment Clause allows the display of three Latin crosses on public school property. *See* U.S. Const. amends. I, XIV. Because the Court finds that Las Cruces' name is widely understood in the community to mean "the crosses," and that the Establishment Clause's strictures are otherwise satisfied, Defendants' motion is granted as to Plaintiff's claims related to a sculpture and to Las Cruces Public Schools' Policy # 424, as written. *See O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1231 (10th Cir. 2005). Defendants are not, however, entitled to summary judgment on Plaintiff's remaining claims: the

record is inadequately developed.  *See Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1241 (10th Cir. 2005); *Foremaster v. City of St. George*, 882 F.2d 1485, 1492 (10th Cir. 1989).  Plaintiff's motion is denied.

I.      **Introduction.**

        A.      **The Parties.**

                1.      **Plaintiff Weinbaum.**

        Plaintiff Paul F. Weinbaum is a New Mexico resident and taxpayer who lives within the boundaries of the Las Cruces Public Schools ("LCPS").[1]  (Pretrial Order [Doc. 139] 5.)  Plaintiff Weinbaum has a child enrolled in a LCPS school.  (*Id.*)

                2.      **Defendants Las Cruces Public Schools, Charles Davis, Leonel Briseno, Gene Gant, John Schwebke, and Sharon Wooden.**

        Defendant LCPS is a "governmental entity created by statute" and "governed by a[n] [elected] School Board."  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 2; Martinez Aff. ¶ 4.)  It is the second largest school district in New Mexico, encompassing, *inter loci*, the City of Las Cruces.  *See* http://www.lcps.k12.nm.us/LCPS_Overview/index.shtml.

        Defendants Davis, Briseno, Gant, Schwebke, and Wooden are Las Cruces School Board Members ("Board Members") who, together with the LCPS Superintendent, "are responsible for creating and enforcing [LCPS] school policies within the law."[2]  (Answer [Doc. 4] ¶ 7.)  Defendant

_____

[1]On October 11, 2006, this Court granted Jesse V. Chavez's motion to be removed as a pro se plaintiff. (Order Granting Mot. Withdraw [Doc. 136].)  Prior to that time, Chavez had been a party plaintiff.  Chavez had, for instance, moved with Plaintiff Weinbaum for summary judgment.  For clarity's sake, all references to filings made by Weinbaum and Chavez will be referred to in the singular (e.g., Pl.'s - rather than Pls.' - Mem. Supp. Mot. Summ. J.).

[2]On February 5, 2004, Plaintiff's claims against former LCPS Superintendent Louis Martinez were dismissed.  (Mem. Op. & Order [Doc. 22] 1.)  Prior to that time, Martinez had been a party defendant.

Board Members are sued in their official capacity.  Hence, Plaintiff is "effectively suing the Las Cruces School Board in addition to [LCPS]."  (Mem. Op. & Order [Doc. 22] 5 ("The Court notes that the Las Cruces School Board is an entity distinct from [LCPS].").)

**B.      The LCPS Emblem, Sculpture, and Policy # 424.**

Plaintiff, suing under 42 U.S.C. § 1983, claims that Defendants' use of an emblem, the installation and display of a sculpture, and Defendants' Policy # 424 violate the Establishment Clause of the First Amendment.[3]

**1.      Emblem affixed to LCPS maintenance vehicles.**

Plaintiff's first claim relates to an emblem affixed to Defendants' fleet of, approximately thirty five, maintenance vehicles.[4]  (Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 76] 1; Wilson Dep. 25:1-8 (estimating that LCPS owns "[a] couple hundred vehicles" total).)  Defendants submit that the emblem has been used on LCPS maintenance vehicles since the early 1960s.  (Pretrial Order [Doc. 139] 6; Defs.' Mem. Supp. Summ. J. [Doc. 33] 2 (citing Wilson Dep. 10:1-7).)  They maintain that "[t]he origin of the emblem . . . is unknown."  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 2 (citing Martinez Aff.).)

The circular emblem features a sunburst with three "Latin crosses."  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. D.)  The emblem's diameter is 12 inches.  (Defs.' Reply Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 41] 3 n.1.)  At its center, a blue sunburst is depicted.  Inside the sunburst, there is a white circle containing three, centered, blue crosses.  The white circle's diameter is 1.875 inches;

_____

[3]To the extent Plaintiff alleges that the Defendants violated the New Mexico State Constitution, *see* N.M. Const. art. II, § 11, Plaintiff waived these claims.  (*Compare* Pretrial Order [Doc. 139] 2, *with* Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 18-19.)

[4]Photos of the emblem are attached as Appendix A.  *See infra* app. A.

the three crosses are not equal in size.  (*Id.*)  The largest cross is centered and flanked, on either side, by the two remaining crosses, which are equal in size.

Encircling this symbol are two separate blue bands containing text.  Immediately surrounding the center symbol is a blue band with thin, white, capital-letter text that reads: "FOR OFFICIAL USE ONLY."  The first two words appear above the sunburst containing the crosses; the latter two words are situated below.  The exterior blue band features larger capital-letter text that reads: "LAS CRUCES PUBLIC SCHOOLS."  Like the arrangement of the "for official use only" text, the exterior band features the words "Las Cruces" above the sunburst containing the crosses and "public schools" below.

## 2.    Sculpture at LCPS Sports Complex.

Plaintiff's second claim concerns a sculpture - depicting, *inter alia*, "three stylized crosses" - that is displayed at the LCPS Regional Sports Complex ("Sports Complex") in Las Cruces, New Mexico.[5]  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] 3.)  The artwork was commissioned following a competitive design competition sponsored by the New Mexico Arts ("NM Arts") Art in Public Places Program and the LCPS Local Selection Committee ("LSC").[6]  (*Id.* Ex. L (NM Arts' Prospectus # 155).)

In Prospectus # 155, NM Arts and the LSC solicited proposals for a "three dimensional

---

[5]The Sports Complex is known colloquially as the "Field of Dreams."  *See* http://www.lcps.k12.nm.us/-Departments/-Athletics/field.shtml.  Photos of the sculpture are attached as Appendix B.  *See infra* app. B.

[6]The LCS held four meetings, which were publically advertised, for Prospectus # 155: (1) June 12, 2001 (LCS organization and duties, as well as preliminary prospectus, discussed); (2) July 3, 2001 (Prospectus # 155 finalized); (3) December 7, 2001 (initial artist submissions discussed; three finalists selected); and (4) February 5, 2002 (finalists' presentations to LCS; Bird's sculpture selected).  (Defs.' Resp. Pl.'s Interrog. # 20 [Doc. 36].)  Defendants stated that "the only closed portion of any [LCS] meeting occurred on February 5, 2002 when the [LCS] . . . deliberated on the [finalists'] proposals."  (*Id.*)  The vote selecting Bird's sculpture was "public and unanimous."  (*Id.*)

4

artwork designed to be placed on or near the exterior wall" of the new Sports Complex.  (*Id*.; Bird

Dep. 8:4-16.)  The prospectus stated that, in addition to other requirements, submissions should

incorporate the theme: "The Pursuit of Excellence."  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. L

(NM Arts' Prospectus # 155).)  Prospectus # 155 noted that the piece of art selected would be

situated on or near the "southernmost outer wall" and needed to be "easily seen from a distance of

forty feet," but that the "style of artwork is open."  (*Id*.)

Ultimately, the LSC selected artist Ruth Bird's sculpture, entitled "Unitas, Fortitudo,

Excellentia," from among three finalists.[7]  (*Id*. Ex. M (LCPS Press Release of 5/21/03).)  Consistent

with NM Arts policy, Bird submitted her proposal, along with "her resume and . . . slides of her

[previous] work."  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 4.)  Bird's proposal comported with

Prospectus # 155's specifications and application requirements and explained her submission in some

detail.  (Bird Aff. Ex. E (Bird Proposal).)  NM Arts paid for the sculpture, which was dedicated on

---

[7]The record reflects that, in mid-May 2002, Plaintiff met with LCS member Schutz to "discuss the selection process of the [NM Arts] artwork for the [LCPS] Sports Complex."  (Pl.'s Resp. Answer [Doc. 6] Ex. M ("Documentation of other sculpture proposals"); *see also* Compl. ¶ 11.)  Aside from viewing three of the seven "maquettes" submitted in response to Prospectus # 155, it is unclear what else Plaintiff and Defendant Schutz's meeting entailed.  The Court recognizes that Ex. M is not attached to a sworn affidavit, but notes that: (1) Defendants did not object to its consideration on those grounds; (2) it is not material to the outcome here; and (3) in any event, Plaintiff could testify to the statement.  *See* Fed. R. Civ. P. 56(e); *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir. 1968) ("An affidavit that does not measure up to the standards of 56(e) is subject to a motion to strike . . . [but] formal defects are waived in the absence of a motion or other objection"), *cited with approval in United States v. Colo. Mufflers Unlimited, Inc.*, 116 F. App'x 218, 222 (10th Cir. 2004).  In contrast, Plaintiff's reference to an "investigative report" - allegedly completed by Plaintiff and provided to the "New Mexico Attorney General," "State Auditor," and defense counsel prior to his filing the underlying Complaint - is wholly unsubstantiated and will not be considered.

Additionally, the record indicates that former LCPS Superintendent Martinez had "several meetings with religious leaders" during his tenure, including one held *after* "receiving complaints from [Plaintiff]" regarding the Sports Complex sculpture.  (Defs.' Resp. Pl.'s Interrog. # 12 [Doc. 36].)  Martinez apparently met with these unspecified religious leaders to ascertain "whether or not any of the religious leaders objected to the sculpture."  (*Id*.; *cf.* Defs.' Resp. Pl.'s Interrog. # 11[Doc. 36] (noting that "[u]pon information and belief" Martinez met "with Rabbi Cane [sic], Bishop Ramírez, and Doctor Frank Zamora of the Las Cruces Emanuel Counsel").)  No further information about these meetings' timing or content is reflected in the record; neither party made an issue of these meetings in their briefings.  As such, the Court does not find them material to its determination here.

May 21, 2003.[8]  (Defs.' Resp. Pl.'s Interrog. # 24 [Doc. 36].)

The sculpture features a "hot rolled mild steel" ring - that, in time, has developed a rusty patina - overlaid by three stainless-steel stylized crosses.  (Bird Aff. Ex. E (Bird Proposal).)  The ring is 5.375 inches wide, has a diameter of 7.5 feet, and is severed in two places: at (approximately) the ten o'clock and two o'clock positions.  The bottom portion of the ring is symmetrically inscribed with text that reads, in all-capital letter text, "UNITAS, FORTITUDO, EXCELLENTIA."  (*Id*.)  Bird explained that this phrase translates from the Latin to English as "unity, strength, and excellence." (*Id*.)

Overlaid on the ring are three vertical beams connected by a single horizontal beam.  Placed slightly to the right of center, the longest vertical beam is 8.396 feet long.  It extends slightly above and slightly below the 7.5 feet-diameter ring.  To either side of this beam are two shorter vertical stainless steel beams, which are situated entirely within the circle.  The left beam is 4.865 feet long; the bar to the right is 2.458 feet long.  The cross beam - measuring 2.885 feet in length - bisects the three vertical beams.  All four stainless steel beams are shiny and reflective.

Additionally, two explanatory plaques - located adjacent to Tashiro Road - accompany the artwork.  Like the sculpture itself, the plaques are equipped with lights (presumably to make them visible after dark).[9]

The sculpture is mounted on the exterior, south wall of the football stadium.  There is no pedestrian access to the sculpture from either the Sports Complex or Tashiro Road, approximately

---

[8]The record contains scant information about the sculpture's dedication ceremony.  (*See* Defs.' Resp. Pl.'s Interrog. # 24 [Doc. 36]; Davis Dep. 37-40:15 (noting that a flyer describing Bird's piece, distributed at the May 21, 2003 ceremony, made no reference to "crosses," but spoke in terms of the sculpture's "vertical bars").)

[9]The record contains no information regarding the history or purpose of the sculpture and plaques' lighting.

100 feet away.  The sculpture is fenced off so as to prevent pedestrian ingress/egress.  Consequently, the thousands of fans who attend Sports Complex events do not have access to the sculpture.  The Court and the parties were only able to access the sculpture after securing the assistance of a Sports Complex employee who unlocked the chain-link gate.  Tashiro Road is a two-lane roadway, without curbs, gutters, or sidewalk.  There is no vehicle pullout to allow for reflective viewing of the sculpture.

### 3.     Policy # 424.

Plaintiff's third claim is that LCPS Policy # 424, "Religion in the Schools," violates the Establishment Clause.  (Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 76] 1.)  Policy # 424 provides guidance to LCPS employees "on the topic of religion in schools."[10]  (Pretrial Order [Doc. 139] 6.)

### C.     Plaintiff's Emblem, Sculpture, and Policy Claims.

### 1.     Procedural Posture.

Plaintiff filed the instant case pro se on September 9, 2003.  (Compl. 1.)  On May 14, 2003 and June 4, 2003, Defendants and Plaintiff filed their respective cross motions for summary judgment.  Following a November 15, 2004 pretrial conference, the Court stayed this litigation pending the Supreme Court's ruling in *McCreary County v. ACLU of Ky.*, 354 F.3d 438 (6th Cir. 2003), *cert. granted*, 543 U.S. 924 (2004).  (Order Staying Case [Doc. 62] 1 (explaining that the high court's anticipated decision might "clarify and refine" Establishment Clause analysis).)

The Supreme Court handed down its *McCreary County v. ACLU of Ky.*, 125 S. Ct. 2722 (2005), decision on June 27, 2005.  Following a September 28, 2005 status conference, the Court

---

[10]The policy, in its entirety, is attached as Appendix C.  *See infra* app. C.

7

requested supplemental briefing on *McCreary County*, as well as its companion case, *Van Orden v. Perry*, 125 S. Ct. 2854 (2005).

### 2. Relief Sought.

Plaintiff seeks to have: (1) all "three Latin crosses" emblems, as well as all "permanent religious symbols," removed from LCPS property; (2) Defendants recognize that Latin crosses are "Christian religious symbols in any and all venues"; (3) Defendants "[p]ublicly apologize" to Plaintiff for the "religious prejudice exhibited toward them." (Pretrial Order [Doc. 139] 2-3.) As to the Sports Complex sculpture, Plaintiff requests that taxpayer funds expended on the artwork be reimbursed. (*Id.* 2.)

Regarding Policy # 424, Plaintiff seeks: (1) to have the word "religion" replaced by its plural form, "religions"; (2) development of "written safeguards and checklists" regarding Policy # 424 and made available for "public viewing" at each LCPS school; (3) formation of, and inclusion in, a "religious minority-based" citizen committee that would monitor LCPS compliance with Policy # 424; and (4) removal of "all temporary religious symbols" from LCPS property that are not "properly associated" with a LCPS instructor's lesson plan. (*Id.* 2-3.)

### D. Standing.

Federal courts "are courts of a limited jurisdiction." *Mires v. United States*, No. 05-6186, 2006 WL 3072758, at *2 (10th Cir. Oct. 31, 2006) (quoting *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 8 (1799)). This Court - compelled, "in every case and at every stage of the proceeding, [to] satisfy itself as to its own jurisdiction" - issued, *sua sponte*, an Order to Show Cause to clarify

Plaintiff's standing to maintain this action.[11]  *Id.* (internal quotation marks and citation omitted).  For the reasons which follow, the Court is satisfied that Plaintiff has standing to assert these constitutional claims.  (Pl.'s Resp. Order to Show Cause [Doc. 141].)

Article III limits federal courts' authority to adjudicate only "Cases" and "Controversies." U.S. Const. art. III, § 2.  This provision "requires that a litigant have standing to bring a federal claim," or in layman's terms, that: "a plaintiff . . . establish a personal stake in the outcome." *Foremaster*, 882 F.2d at 1487.  To have standing to sue, a litigant must evidence "an 'injury in fact,' which the Supreme Court has defined as 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  In the "context of alleged violations of the Establishment Clause":

> standing is clearly conferred by non-economic religious values.  The Supreme Court requires, however, that plaintiffs alleging non-economic injury must be directly affected by the laws and practices against which their complaints are directed. Allegations of personal contact with a state-sponsored image suffice to demonstrate this kind of direct injury.

*O'Connor*, 416 F.3d at 1222-23 (internal quotation marks and citations omitted); *see generally Raines v. Byrd*, 521 U.S. 811, 818 (1997) (noting that "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring [a particular] suit").

As outlined above, *see supra* Part I.B., Plaintiff maintains that Defendants' allegedly "unlawful conduct" caused him "personal injury."  *See O'Connor*, 416 F.3d at 1222.  Specifically, Plaintiff

---

[11]The parties stipulated to this Court's subject matter jurisdiction.  (Pretrial Order [Doc. 139] 1); *but cf. Mires*, 2006 WL 3072758, at *2 (a "lack of federal jurisdiction cannot be waived or overcome by an agreement of the parties" (internal quotation marks and citation omitted)).

alleges that, "[t]he *constant exposure* to the typical three Latin crosses found on [LCPS] . . . property

is a constant reminder to the Plaintiff and his child [a LCPS student] that they are less that [sic] fully

accepted in the community and in the schools."  (Pl.'s Resp. Order to Show Cause [Doc. 141] 2

(emphasis added).)  He also alleges that the "prolific and constant display of the Latin crosses on

public school property," coupled with the compulsory nature of public education, has "created a

fearful environment for the Plaintiff as a parent to educate his child in the religious beliefs of the

family."  (*Id.* 3.)  Plaintiff is a resident of Las Cruces and his child is enrolled in a LCPS school.  (*Id.*

5.)

Plaintiff's allegations are sufficient to establish standing: he has stated a "'*personal injury*

fairly traceable to [Defendants'] . . . allegedly unlawful conduct and likely to be redressed by the

requested relief.'"[12]  *O'Connor*, 416 F.3d at 1222 (emphasis in original) (quoting *Raines*, 521 U.S.

at 818) (allegations of being "frequently brought into direct and unwelcome contact with the

[challenged] statue are sufficient"); *Foremaster*, 822 F.2d at 1490 ("allegations of direct, personal

contact suffices [sic] as non-economic injury."); *see also Lippoldt v. Cole*, Nos. 04-3156, 04-3168,

04-3322, 2006 WL 3200864, *9 (10th Cir. Nov. 7, 2006) (allegations of "abridgement of [plaintiffs']

First Amendment rights" sufficient injury for compensatory damages claim).

---

[12]The sufficiency of Plaintiff's allegations for standing purposes is further buttressed when his pro se status is considered together with the highly technical, and often confused, nature of the standing doctrine.  *See Reynoldson v. Shillinger*, 907 F.2d 124, 125 (10th Cir. 1990) (giving a "broad reading" to pro se plaintiff's filings where standing analyzed); *Martin v. Cent. States Emblems, Inc.*, 150 F. App'x 852, 853 n.1 (10th Cir. 2005) (same) ("Because Mr. Martin has proceeded pro se at all times, we liberally construe his court filings."); (*compare* Pretrial Order [Doc. 139] 2-3, 5), *with O'Connor*, F.3d at 1223 (standing found to exist) ("[Plaintiffs] claim they were *constantly exposed* to its presence and were forced to alter their schedules and routes across campus to avoid it." (emphasis added), *and Foremaster*, 822 F.2d at 1491 (standing found to exist) ("Although [plaintiff] did not contend he changed his behavior, he did allege that the presence of the religious logo in the City Hall offended and intimidated him."), *with Robinson v. City of Edmond*, 68 F.3d 1226, 1228 (10th Cir. 1995) (standing found to exist) ("Plaintiffs are non-Christians who live or work in Edmond."), *cert. denied*, 517 U.S. 1201, 1202 (1996) (Rehnquist, C.J., dissenting) (questioning whether standing existed below: "[m]ere presence in the city, without further allegations as to injury, quite clearly fails to meet the standing requirements").

II.       **Establishment Clause Jurisprudence.**

In 1997, Establishment Clause jurisprudence was considered to be in "hopeless disarray," and "the task of parsing the Supreme Court's recent Establishment Clause cases [proved] nothing short of Herculean." *Bauchman v. W. High Sch.*, 132 F.3d 542, 551, 565 (10th Cir. 1997).  What was true in 1997 is no less true in 2006, particularly in light of the 10 separate opinions authored in the *McCreary County* and *Van Orden* decisions.  *See McCreary County*, 125 S. Ct. at 2722; *Van Orden*, 125 S. Ct. at 2854.  It is into this murky, turbulent water that this Court must wade.

The Religion Clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.[13]  The First Amendment "expresses our Nation's fundamental commitment to religious liberty by means of two provisions--one protecting the free exercise of religion, the other barring establishment of religion." *McCreary County*, 125 S. Ct. at 2746 (O'Connor, J., concurring).  With the Religion Clauses, the Framers "intended not only to protect the integrity of individual conscience in religious matters, . . . but to guard against the civic divisiveness that follows when the Government weighs in on one side of religious debate." *McCreary County*, 125 S. Ct. at 2742 (Souter, J.) (citing *Wallace v. Jaffree*, 472 U.S. 38, 52-54 & n.38 (1985)).  The First Amendment was "meant to endure, and to meet 'exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur.'" *Id*. at 2744 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 416 (1819)).

Penned in 1789, the Establishment Clause was "'intended to endure for ages to come.'" *See*

---

[13]The First Amendment applies to "the States and their political subdivisions" through the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000).

*id.* at 2745 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 415). It is therefore significant that the Founders "were aware that they were designing a government for a pluralistic nation-- a country in which people of different faiths had to live together." Jon Meacham, *American Gospel* 101 (2006). Indeed, at that time, the young nation already boasted considerable "religious diversity," with "Congregationalists dominating New England, Anglicans down south, Quakers in Pennsylvania, Catholics huddling together in Maryland, [and] Baptists seeking refuge in Rhode Island." Akil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 45 (1998).

"The First Amendment contains no textual definition of 'establishment', and the term is certainly not self-defining." *McCreary County*, 125 S. Ct. at 2742. Given the competing values underlying the First Amendment and the need to accommodate an evolving society, "an elegant interpretive rule to draw the line in all the multifarious situations is not to be had." *Id.* There is "'no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible.'" *Van Orden*, 125 S. Ct at 2868 (Breyer, J., concurring in the judgment) (quoting *Sch. Dist. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring)).

Indeed, two of the greatest legal minds of our time, Justice Scalia and Justice Stevens, espouse nearly polar-opposite views of the Establishment Clause. Their respective positions illuminate the divisiveness that the provision's meaning engenders, and demonstrate the issue's complexity.

Justice Scalia rejects the notion that "[r]eligion is to be strictly excluded from the public forum"; he argues that the Establishment Clause permits state "acknowledgment of a single Creator" - specifically, "the God of monotheism." *See McCreary County*, 125 S. Ct. at 2748, 2753 (Scalia, J., dissenting). In support, Justice Scalia cites instances in which early American leaders and official

proclamations of the federal government expressed "gratitude to God" in official or public settings. *Id*. at 2748-49, 2754 (noting that these statements and official acts "show *what [the Clause] meant*" to those who crafted it). Justice Scalia believes that, because the Framers and young government openly "favor[ed] religion . . . [and] invoked God," it is clear that the Establishment Clause does not proscribe state endorsement of "the God of monotheism." *Id*. at 2753, 2755. The Justice patently rebukes the neutrality principle. *See id*. at 2750-52.

With equal zeal, Justice Stevens maintains that the First Amendment "erect[s] a wall of separation between church and state" and that "government must remain neutral between valid systems of belief." *See Van Orden*, 125 S. Ct. at 2875, 2890 (Stevens, J., dissenting). In marked contrast to Justice Scalia, Justice Stevens believes that "the historical record of the preincorporation Establishment Clause is too indeterminate to serve as an interpretive North Star." *Id*. at 2888 (Stevens, J., dissenting) ("the leaders of [the] founding era" held "widely divergent views" of establishment). The Justice posits that, interpreting the provision's meaning, requires examining "the Clause's text and history [and] the broad principles that remain valid today." *Id*. at 2888. Hence, in Justice Stevens' view, "[t]he evil of discriminating today against atheists, 'polytheists[,] and believers in unconcerned deities,' . . . [is] a direct descendent of the evil of discriminating among Christian sects." *Id*. at 2890 (quoting *McCreary County*, 125 S. Ct. at 2753 (Scalia, J., dissenting)).

Justices Scalia's and Stevens' diametrically opposed perspectives on, not only what the Establishment Clause proscribes, but also how to interpret the provision, underscores just how contentious this area of the law remains. Quite plainly, their differing views of history and case law

13

dispel the notion that there are easy answers to be had in Establishment Clause jurisprudence.[14]

When defining the contours of the Religious Clauses, the "touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'"[15] *McCreary County*, 125 S. Ct. at 2733 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).  However, adherence to neutrality must be tempered by a mindfulness of the basic purposes of the Clauses; namely, to '"assure the fullest possible scope of religious liberty and tolerance for all' . . . [and] to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike." *Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment) (quoting *Schempp*, 374 U.S. at 305 (Goldberg, J., concurring), and citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 717-29 (2002) (Breyer, J., dissenting)).

"Manifesting a purpose to favor one faith over another, or adherence to religion generally,

---

[14]Historical cherry picking is not helpful; it is divisive.  In a recent article, Judge McConnell argues that modern Establishment Clause jurisprudence has failed to comprehensively examine America's experience, pre- and post-founding, with establishment.  Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003).  The meticulously researched piece evidences that the young nation's views of establishment were significantly more nuanced and complex than modern case law - with its frequent ad hoc citation to various Founders' statements and official government actions - suggests.  *See id.* at 2115-81 (documenting that a majority of the thirteen colonies had established churches prior to the Revolution, but that establishment took very different forms in, for example, Massachusetts and South Carolina); *see also id.* at 2182-2205 (examining the varied rationales for establishment in different colonies, including theological, political, and theoretical justifications).  Scholarship that examines the Clause's origins - in an unbiased and dispassionate way - as Judge McConnell's article does, contributes a great deal to the otherwise rancorous debate.

[15]At least one court of appeals has questioned the vitality of the neutrality principle.  *See Myers v. Loudoun County Pub. Schs.*, 418 F.3d 395, 402 n.8 (4th Cir. 2005); *but cf. id.* at 409 (Duncan, J., concurring); *id.* at 410 (Motz, J., concurring in the judgment).  Yet, most circuits that have considered the issue following the *McCreary County* decision have recognized the vitality of the "government neutrality" principle.  *E.g.*, *O'Connor*, 416 F.3d at 1223; *Vision Church v. Vill. of Long Grove*, Nos. 05-4144, 05-4234, 2006 WL 3197659, *11 (7th Cir. Nov. 7, 2006); *Staley v. Harris County*, 461 F.3d 504, 513 (5th Cir. 2006); *Selman v. Cobb County Sch. Dist.*, 449 F.3d 1320, 1322 (11th Cir. 2006); *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006); *see also Summum v. City of Ogden*, 297 F.3d 995, 1010 (10th Cir. 2002) (pre-*McCreary* decision).

clashes with the 'understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens . . . .'" *McCreary County*, 125 S. Ct. at 2733 (quoting *Zelman*, 536 U.S. at 718 (Breyer, J., dissenting)). "By showing a purpose to favor religion, the government 'sends the . . . message to . . . nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . .'" *McCreary County*, 125 S. Ct. at 2733 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000)).

Unfortunately, neutrality as the constitutional lynchpin is not free of problems. *See McCreary County*, 125 S. Ct. at 2750 (Scalia, J., dissenting) (discussing why neutrality is a "thoroughly discredited say-so"). Justice Scalia criticizes the inconsistencies inherent in application of neutrality and hypothesizes that the Court's "genuine 'good reason' for occasionally ignoring the neutrality principle . . . is the instinct for self-preservation . . . . the willingness of the people to accept its interpretation of the Constitution as definitive, in preference to the contrary interpretations of the democratically elected branches." *Id.* at 2752 (Scalia, J., dissenting).

The validity of such criticism is reflected in the current state of our society. Efforts to avoid divisiveness and the trend toward neutrality have led to dilution of religious meaning in the United States. *See* Patrick M. Garry, *Religious Freedom Deserves More than Neutrality: The Constitutional Argument for Nonpreferential Favoritism of Religion*, 57 Fla. L. Rev. 1, 6 (2005). "Formal neutrality may indirectly impede the exercise of religious liberty . . . . [and] severely undermine[ ] the theoretical foundation of American religious liberty by subverting the original theology on which it was grounded." Daniel O. Conkle, *The Path of American Religious Liberty: from the Original Theology to Formal Neutrality and an Uncertain Future*, 75 Ind. L.J. 1, 25 (2000). Strict adherence

15

to neutrality squelches the idea that religion is "distinct and distinctly important" to our society.  *Id.*

> Justice Breyer recognized this flaw when he wrote:
>
> [T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious . . . . [s]uch absolutism is not only inconsistent with our national traditions, . . . but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid.

*Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment) (internal citations omitted).

Justice Breyer elaborated:

> [T]ests designed to measure "neutrality" alone are insufficient, both because it is sometimes difficult to determine when a legal rule is 'neutral,' and because 'untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious.'

*Van Orden*, 125 S. Ct. at 2868-69 (Breyer, J., concurring in the judgment) (quoting *Schempp*, 374 U.S. at 306) (Goldberg, J., concurring)).

Under any theory or application of the First Amendment to a governmental display of a religious symbol, the difficult question is always where to draw the line: "[T]here is no test-related substitute for the exercise of legal judgment."  *Id.* at 2869 (citations omitted).  Legal judgment "is not a personal judgment."  *Id.*  The exercise of such  judgment "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes."  *Id.*

At any rate, if anything is clear in Establishment Clause jurisprudence, it is this: "Establishment Clause questions are heavily dependent on the specific context and content of the display."  *See O'Connor*, 416 F.3d at 1222 (citing *Van Orden*, 125 S. Ct. at 2869 (Breyer, J., concurring in the judgment)).  The inquiry is, necessarily, "fact-intensive."  *Van Orden*, 125 S. Ct. at 2869 (Breyer, J.,

concurring in the judgment).  With that in mind, I turn my attention to the facts of this case.

## III.    Context.

### A.    The Christian Cross.

The Christian or Latin cross is an immediately recognizable symbol for most of Christianity.
Although the cross is depicted in many shapes and sizes, the best-known form is the Latin cross, an
equal-armed cross with a longer foot.  For Christians, the cross is the most powerful symbol of their
faith - the symbolic representation of redemption and of the atoning death of Jesus Christ.  For many
others, the cross has historically been a powerful symbol as well; sadly and too often it has been a
symbol of oppression, persecution, and sometimes death.  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex.
N (Ltr. from Bishop Ricardo Ramírez to Pl.) ("the cross itself, because of historical events such as
the Inquisition and the Crusades, are [sic] offensive to certain religious groups").).[16]

On Christmas Day 800, Charlemagne was crowned by Pope Leo III as "the great and peace-
bringing Emperor of the Romans."  Thomas Bokenkotter, *A Concise History of the Catholic Church*
97 (1990).  In a startling example of differing perspectives, Charlemagne was also known as the
"butcher of the Saxons."  Derek Wilson, *Charlemagne* 199 (2006).  In retaliation for  resistance to
Christianization, Charlemagne had 4,500 men beheaded in one day.  Wilson at 46-47.

---

[16]Defendants moved to strike most of the exhibits attached to Plaintiff's Response to Defendants'
summary judgment, including Exhibit N.  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 9; Defs.' Reply Pl.'s Resp.
Defs.' Mem. Supp. Summ. J. [Doc. 41] 2.)  Thereafter, Plaintiff filed an unnotarized "Declaration of Fact" stating,
*inter alia*, that the exhibits he filed "are factual and truthful in their knowledge."  (Pl.'s Decl. Fact [Doc. 50] 1.)

"At the summary judgment stage, the parties need not submit evidence in a form admissible at trial;
however, the content or the substance of the evidence must be admissible."  *Bryant v. Farmers Ins. Exch.*, 432 F.3d
1114, 1122 (10th Cir. 2005) (citation omitted).  Because the exhibits are not material to the Courts decision here, it
need not consider the legal sufficiency of Plaintiff's Declaration at this time.  In any case, Exhibit N may be
considered for summary judgment purposes given that Plaintiff could likely authenticate the letter in short order.
*See Barnes v. United States*, 137 F. App'x 184, 189 (10th Cir. 2005) (finding no abuse of discretion where district
court considered pro se litigant's documents that were not, but could likely be, properly authenticated prior to
trial); *see also infra* notes 27 (citing Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] Ex. O), 41 (citing Pl.'s
Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] Ex. S).

The Crusades (1095-1272) are viewed, by Christians, as noble, inspired efforts to retake the Holy Land.  Bokenkotter at 138.  Muslims and Jews, on the other hand, view the Crusades as cruel and savage.  *Id*. at 139.

During the period of the Spanish Inquisition, Jews were forced to convert to Christianity. James Reston, Jr., *Dogs of God: Columbus, the Inquisition, and the Defeat of the Moors*, 260-61 (1990).  Refusal to convert could result in expulsion, imprisonment, or death.  *Id*.  Synagogues were turned over to the royal treasury or converted to Christian Churches.  *Id*.  Over 120,000 Jews were expelled from Spain in 1492, a region where they had lived and prospered for over 800 years.  *Id*. at 263.

Variants of the cross were prominent symbols in Nazi Germany.  While the swastika was the most notorious example, Nazi military decorations included the Iron Cross, the Knight's Cross, and the Grand Cross.  Gordon Williamson, *The Iron Cross: A History* 1813-1957 65-66 (1990).  *Id*. Millions suffered through one of mankind's darkest hours, at the hands of those proudly wearing crosses.

### B.     The Significance of Three Crosses.

The New Testament describes the crucifixion of Jesus.  The gospels of Matthew, Mark, and Luke indicate that the Romans crucified two criminals along with Jesus at Calvary, one on His right side, and the other on the left. *Matthew* 27:38; *Mark* 15:27; *Luke* 23:32-33.  From these passages, the "three crosses"--one Latin cross, slightly taller than the crosses to the right and left of it--have come to symbolize the crucifixion of Jesus along with the two criminals.

18

### C.       Brief History of Las Cruces.

Las Cruces is New Mexico's second-largest city.  It is located in the Rio Grande Valley, forty miles north of El Paso, Texas and Ciudad Juarez, Chihuahua, Mexico, and about 300 miles south of Santa Fe, New Mexico.  Founded as a village in 1849, Las Cruces incorporated as a town in 1907, and reincorporated as a city in 1946.  (Hunner Report [Doc. 88] 6.)[17]

Native Americans occupied the region before the 16th century.  Warren A. Beck, *New Mexico, A History of Four Centuries* 23 (6th ed. 1975).  From 1527 to 1537, Alvar Nunez Cabeza de Vaca, Alonso del Castillo Maldonando, Andrés Dorantes de Carranca, and the Moor Estevan wandered the Southwest after they were marooned near present-day Galveston, Texas.  (Hunner Report [Doc. 88] 3.)  At least six Spanish expeditions followed, propelled by the myth of the Seven Cities of Cibola.  Marc Simmons, *New Mexico, An Interpretive History* 13-14, 35 (Univ. of N.M. Press, 2d ed. 1988).  None of the members of the early expeditions stayed and settled in the area.  *Id.* at 35.

In 1598, Don Juan de Oñate and a group of settlers traveled north from New Spain, and formally declared possession of Nuevo México when they crossed the Rio Grande near present-day El Paso.  Beck, *supra,* at 53; Simmons, *supra*, at 35.  As he continued north along the Rio Grande Valley through present-day New Mexico, Oñate extended the trail known as "El Camino Real de Tierra Adentro," ("Camino Real") which translates as "The Royal Road to the Interior Lands."

---

[17]Jon Hunner, Ph.D, Associate Professor and Director of the Public History Program at New Mexico State University, was appointed to serve as an expert witness on the history of Las Cruces, including the historical context of the name, "Las Cruces," and the use of crosses within the community of Las Cruces.  (Hunner Report [Doc. 88]); *see* Fed. R. Evid. 706.  And while Dr. Hunner is an expert on Las Cruces history, he is not qualified to render legal opinions.  The Court, therefore, strikes Section Two of the Hunner Report, entitled "Governmental Protection of the Practice of Religion," the second and third paragraphs on page 19, continuing to page 20, and any other legal opinions rendered by Dr. Hunner.  *See Grace United Methodist Church v. City Of Cheyenne,* 451 F.3d 643, 669 (10th Cir. 2006).

(Hunner Report [Doc. 88] 3-4.)  Although the Camino Real passed through the site that would become Las Cruces, permanent settlement of the area was delayed due to lack of reliable water and Native American raids.  (*Id.*)  Oñate continued north of present-day Santa Fe, and established the capital of the province at Ohkay Ohwingeh (formerly San Juan Pueblo).  Gordon Owen, *Las Cruces New Mexico 1849-1999: Multicultural Crossroads* (1999); www.gov.state.nm.us/press/2005/dec/121605_01.pdf.

Except for the Pueblo Revolt (1680-1692) and the Reconquest (1693-1700), the Spanish ruled Nuevo México until 1821,when Mexico achieved independence from Spain.  Owen, *supra*, 15-18.  After the Santa Fe Trail opened in 1821, the Camino Real became known as the Chihuahua Trail.  (Hunner Report [Doc. 88] 4.)

In 1848, through the Treaty of Guadalupe-Hildalgo, Mexico ceded Nuevo México, and much of the present-day Southwest, to the United States.  (Hunner Report [Doc. 88] 14-15); Owen at 25.  In 1849, Pablo Melendres, the mayordomo of Doña Ana, a village about fifteen miles to the north of present-day Las Cruces, asked the United States Army to help relieve overcrowding in his community.  (Hunner Report [Doc. 88] 4.)  Lt. Delos Sackett used a rawhide rope to lay out a grid of streets and founded *El Pueblo del Jardin de Las Cruces*, which translates as "the City of the Garden of the Crosses."  (*Id.*)

**D.     Origin of the Name "Las Cruces."**

"Las Cruces" is Spanish for "the crosses."  Plaintiff is not willing to concede this translation and suggests that the term "Las Cruces" can also be translated "the crossings."  While some historians have noted this possible ambiguity, Owen, *supra*, at 31, and it is true that the plural of both *cruz* (cross) and *cruce* (crossing) is *cruces*, the potential for confusion dissipates when the gender of the

respective nouns is considered.  All nouns in Spanish have either masculine or feminine gender, except for one or two nouns of undecided gender.  John Butt & Carmen Benjamin, *A New Reference Grammar of Modern Spanish* 1 (3d ed. 2000).

*Cruz* is a feminine noun, *Concise Oxford Spanish Dictionary* 175 (2d ed. 1998), the plural of which, accompanied by its definite article (which must agree in case and gender with the noun modified) is rendered *las cruces*, while *cruce* is a masculine noun, *id.*, the plural of which, accompanied by its definite article, is rendered *los cruces*.  Indeed, if the village had been named for crossroads or crossings, it would have been named *Los Cruces*, and not *Las Cruces*.

Notwithstanding basic linguistics and adding to the uncertainty, one theory on the origin of the name holds that the name "Las Cruces" originated from the intersection of the Chihuahua Trail and the Butterfield Overland Mail Route near Las Cruces.  (Hunner Report [Doc. 88] 4.)  However, this theory lacks historical, as well as linguistic, support.  (*Id.*)  The Butterfield Overland Mail Route began service through the area in the 1850s.  (*Id.*)  In that the Butterfield Trail passed through the area only after the village of *El Pueblo del Jardin de Las Cruces* was founded, the "the crossroads" translation likely would not have been the source of the name "Las Cruces."  (*Id.*)

The more reliable, and widely held, theory holds that the name, Las Cruces, described groups of crosses placed on graves and the sites of massacres that occurred in the area between 1712 and 1840.  (Hunner Report [Doc. 88] 4.)  Several massacres occurred along the Camino Real/Chihuahua Trail near present-day Las Cruces.  (Hunner Report [Doc. 88] 4.)  In 1712, a group of colonists traveling north to Santa Fe were attacked by Apaches at their campsite about thirty to forty-five miles north of Paso del Norte (present-day Ciudad Juarez).  (*Id.*)  Soldiers from Paso del Norte buried the victims and erected crosses over the graves.  (*Id.*)

In 1787, a bishop, a priest, two military officers, four trappers, and four choir boys were killed at the site.  (Hunner Report [Doc. 88] 4.)  According to Owen, the attack occurred near the Rio Grande and only one boy survived.  Owen, *supra*, at 30.  In a report dating from 1830, a caravan of forty people traveling south from Taos were all killed in the area, resulting in a "forest of crosses." (*Id.*); Owen, *supra*, at 31.  Another theory held that the brush along the river provided such fine cover for the Apaches that there were several small clusters of crosses, each marking a massacre, scattered around the river bank.  Owen, *supra*, at 31.

On February 12, 1847, an eyewitness recorded the following observation in her diary:

> Yesterday, we passed over the spot where a few years since a party of Apaches attacked Gen. Armijo as he returned from the Pass with a party of troops, and killed some fourteen of his men, the graves of whom, marked by a rude cross, are now seen.

(Hunner Report [Doc. 88] 4-5 (quoting Susan Shelby Magoffin, *Down the Santa Fe Trail and Into Mexico* 203 (Univ. of Nebraska Press, 1982)).)  The village of *El Pueblo del Jardin de Las Cruces*[18] was founded two years after the diary entry.  This first-hand report is the most compelling evidence of crosses standing in the area that would, shortly, become Las Cruces.

During the Spanish colonial and Mexican periods, most travelers and settlers in the area were Catholic and crosses were used to mark graves or locations of massacres.  (Hunner Report [Doc. 88] 5.)  The practice of marking graves and the sites of tragedies with crosses remains a common practice in New Mexico to this day.  (*Id.*)  The accounts of massacres in the area support the premise that multiple crosses marked the site in 1849, when the village was founded and named.  (*Id.*)  While there may be some confusion regarding the origin of the name, there is no dispute of material fact that the

---

[18] Spanish speakers will recognize that "*jardin de las cruces*," garden of the crosses, may well be a euphemism for a cemetery, lending further support for the notion that the name *Las Cruces* means "the crosses."

name Las Cruces means "The Crosses."

### E. Crosses Used as Official Symbols of the Municipality of Las Cruces.

Notably, the City of Las Cruces has long used crosses in its official insignia.  The earliest documented use of three crosses in an official symbol of Las Cruces consists of a lease agreement between the Town of Las Cruces and Mrs. A.L. Sweet, dated July 28, 1941.  (Hunner Report [Doc. 88] Ex. 1.)  The Town's letterhead contained a grouping of three crosses, the one in the middle larger and higher than the others, with the motto, "The City of the Crosses."  (*Id.*)

Before 1946, the Town's seal was a bunch of grapes.  (Hunner Report [Doc. 88] Ex. 2.)  On April 16, 1946, the same year that Las Cruces incorporated as a City, the local newspaper reported:

> "At [Mayor Sam] Klein's request, the council-elect also gave [City Clerk] Mrs. Jackson authority to order a new seal of the city of Las Cruces to replace the old town seal which consists of a bunch of grapes.  The new seal designed by [City Attorney E.G.] Shannon will now show three crosses."

(Hunner Report [Doc. 88] Ex. 4.)  The City seal has contained three crosses to this day.  (Hunner Report [Doc. 88] Ex. 3.)  Mayor Sam Klein was Jewish.  Henry J. Tobias, *Jews in New Mexico*, (1990).

Las Cruces celebrated its centennial in October 1949.  (Hunner Report [Doc. 88] Ex. 5.)  The cover of a publication concerning the centennial included three crosses hovering over a depiction of the city skyline against the backdrop of the Organ Mountains.  (*Id.*)  The cover also included a flying missile, Tortugas Peak, a plowed field, a conquistador carrying a flag, three friars bearing a cross, a Native American on horseback brandishing a rifle, a farmer wielding a hoe, and a graduate holding a diploma.  (*Id.*)

In the 1950s, three interlocking crosses emblazoned the sides of Las Cruces police cars.

(Hunner Report [Doc. 88] Ex. 6.)  The cover of the City's 1963-64 Annual Report included several images illustrating city services and a symbol consisting of three crosses surrounded by a sunburst. (Hunner Report [Doc. 88] Ex. 8.)  The center cross was slightly taller than the others.  (*Id.*)  The cover of the 1965 Annual Report employed a slightly different version of the three-crosses-in-a-sunburst symbol.  (Hunner Report [Doc. 88] Exs. 9, 10.)  The version on the 1965 Annual Report is very similar to the symbol currently used by the Las Cruces Public Schools on maintenance vehicles.  (Hunner Report [Doc. 88] Ex. 10.)

As of 1969, three crosses, with the center cross larger and higher than the others, adorned the outside of city hall.  (Hunner Report [Doc. 88] Ex. 7.)  Subdivision maps dating from 1972 and 1986 display the three-crosses-in-a-sunburst motif rising over the Organ Mountains.  (Hunner Report [Doc. 88] Ex. 11.)

Raymond Garcia, a lieutenant with the Las Cruces Fire Department, previously worked as a purchasing clerk for the City.  (Hunner Report [Doc. 88] 9.)  Mr. Garcia recalls that, in 1974, Ray Escalante, Director of Facilities for the City during the early 1970s, asked Mr. Garcia to update a metal sculpture hanging in City Hall.  (Hunner Report [Doc. 88] 9.)  The old sculpture depicted three crosses, a yucca plant, a roadrunner, and the Organ Mountains.  (*Id.*)  In redesigning the sculpture, Mr. Garcia re-used the three crosses, and added a flaming circle as a tribute to the Johnny Cash song "Ring of Fire."  (*Id.*)  Mr. Garcia describes himself as a former "long-haired, no-religion, Black Sabbath music lover" and insists that he had absolutely no intention to endorse religion when he redesigned the sculpture.  (*Id.*)

Bobby De La Rosa, who was employed in the City's drafting department in the early 1970s, designed a symbol of three crosses encased in a Zia symbol that is used on the sides of Las Cruces

police cars.  (Hunner Report [Doc. 88] 8.)

   **F.   Crosses used to identify non-religious entities in Las Cruces.**

   The Las Cruces Chamber of Commerce has used three crosses as a symbol since 1970,

(Hunner Report [Doc. 88] Ex. 14), and currently includes three crosses in its logo.  *See* http://www.

lascruces.org/.  A number of businesses in Las Cruces use three crosses to identify themselves as local

enterprises.  (*E.g.*, Briseno Dep. 24:4-14 ("[F]or secular organizations such as [LCPS] . . . th[e]

[three crosses] symbol is used to represent the name of Las Cruces."); *id.* 21:17-25 (noting that the

meaning of the three crosses symbol "depends on . . . in what context the crosses are used"); *see also*

Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. N (Ltr. from Bishop Ricardo Ramírez to Pl.) ("The crosses

in the area are expressive of the City of Las Cruces and are not meant to promote religion.").)  Lastly,

in addition to the emblem and sculpture at issue here, as early as 1919, the annual yearbook at Las

Cruces High School was called "The Crosses."  (Hunner Report [Doc. 88] 10, Ex. 13.)

**IV.   Summary Judgment Standard.**

   Summary judgment "should be granted if the evidence submitted shows 'that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.'"  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006)

(quoting Fed. R. Civ. P. 56(c)).  In applying this standard, a court must "view the evidence and draw

reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Id.* (internal

quotation marks and citation omitted).  The court looks to see "'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law.'"  *Allen v. Sybase, Inc.*, No. 04-4045, 2006 WL 3020595, at *5 (10th Cir. Oct. 25, 2006)

(quoting Fed. R. Civ. P. 56(c)).  "A mere scintilla of evidence in support of the nonmoving party's position, however, is insufficient to create a genuine issue of material fact."  *Grace United Methodist Church*, 451 F.3d at 649 (internal quotation marks and citation omitted).

The moving party shoulders "the initial burden to show that there is an absence of evidence to support the nonmoving party's case."  *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks and citations omitted).  If the moving party satisfies this burden, the other party must "identify specific facts that show the existence of a genuine issue of material fact."  *See id.* ("party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.").

"A fact is material if under the relevant substantive law it is essential to proper disposition of the claim."  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005) (internal quotation marks and citation omitted).  An otherwise well-taken summary judgment motion is not, however, defeated by the "mere existence of *some* alleged factual dispute between the parties . . . the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## V.    *Lemon* and its Limits.

The "traditional standard" for Establishment Clause analysis is the three-part test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1258-59 (10th Cir. 2005) (internal quotation marks and citations omitted).  The *Lemon* test provides that "'government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement.'"  *O'Connor*, 416

F.3d at 1224 (quoting *Bauchman*, 132 F.3d at 551).

Application of the *Lemon* test has proven contentious. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 399 (1993) (Scalia, J., concurring in the judgment). Justice Scalia has lamented that selective application of *Lemon* spawned a "strange Establishment Clause geometry of crooked lines and wavering shapes." *Id.* "Acknowledging *Lemon*'s weaknesses," Justice O'Connor crafted a concurring opinion in *Lynch v. Donnelly*, that encouraged the Court "to refine the *Lemon* analysis to focus more on whether government is 'endorsing' religion." *Bauchman*, 132 F.3d at 551 (citing *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984)). Justice O'Connor's concurrence provided a sound analytical framework for evaluating governmental use of religious symbols. *See O'Connor*, 416 F.3d at 1224; *e.g.*, *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 (1989) (holiday display featuring crèche and Chanukah menorah).

Under Justice O'Connor's "endorsement test," the "'government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that "religion or a particular religious belief is favored or preferred.'" *O'Connor*, 416 F.3d at 1224 (quoting *Bauchman*, 132 F.3d at 551). Both the purpose and effect prongs are analyzed through the eyes of an "objective observer." *McCreary County*, 125 S. Ct. at 2734; *see also O'Connor*, 416 F.3d at 1228. An objective observer "takes account of the traditional external signs that show up in the 'text, legislative history, and implementation . . .' or comparable official act." *McCreary County*, 125 S. Ct. at 2734 (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308). The objective observer is "'presumed to be familiar with the history of the government's actions and competent to learn what history has to show.'" *Id.* at 2737 (citing *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308).

The plurality opinion in *Van Orden* upheld a Ten Commandments display without a discussion

of the *Lemon* factors or the endorsement test.  *Van Orden*, 125 S. Ct. at 2861-64 (Rehnquist, C.J.).

However, until the Court overrules *Lemon*, it remains binding precedent.  *O'Connor*, 416 F.3d at

1224.  The Tenth Circuit continues to apply the *Lemon* factors, as modified by the endorsement test,

while remaining mindful of the teachings of *McCreary County* and *Van Orden*.[19]  *Id.*

### A.      Purpose.

Purpose probes "whether the government's *actual* purpose is to endorse or disapprove of

religion."  *O'Connor*, 416 F.3d at 1224 (emphasis added) (internal quotation marks and citation

omitted).  Courts need not, and should not, engage in "judicial psychoanalysis" of the government

actors.  *McCreary County*, 125 S. Ct. at 2734 (citation omitted).  Rather, the Court is charged with

assessing what "official objective" precipitated the challenged action from "readily discoverable fact."

*Id*.  Generally, "provided that the reason is 'genuine, not a sham, and not merely secondary to a

religious objective,'" courts "accord 'deference' to . . . clear government statement[s] of [] actual

---

[19]*McCreary* and *Van Orden*'s effect on Establishment Clause analysis in the circuit courts of appeal warrants further mention.  As discussed above, the *Lemon*-endorsement test no longer stands alone, following the Supreme Court's most recent pronouncement on the Establishment Clause.  *See McCreary County*, 125 S. Ct. at 2727; *see Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment).  Neither *McCreary County* nor the *Van Orden* plurality applied *Lemon* or any modified version thereof.  Some courts of appeal have, as a result, declined to apply the *Lemon*-endorsement test, relying instead on general, free-form judicial assessments of the Establishment Clause challenges presented.  *See Van Orden*, 125 S. Ct. at 2869 (Breyer, J., concurring in the judgment) (stating that there is no "test-related substitute for the exercise of legal judgment").  *E.g.*, *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 778 n.8 (8th Cir. 2005) (Ten Commandments display) ("Taking our cue from Chief Justice Rehnquist's opinion for the Court and Justice Breyer's concurring opinion in *Van Orden*, we do not apply the *Lemon* test."); *Myers v. Loudoun County Pub. Schs.*, 418 F.3d 395, 402 (4th Cir. 2005) (Pledge of Allegiance in public schools) (finding in a "borderline case" that the "history of our nation, coupled with repeated dicta from the Court respecting the constitutionality of the Pledge guides our exercise of that legal judgment in this case").  But, notably, most circuits that have addressed the issue - including the Tenth Circuit - continue to apply the *Lemon* and endorsement test, while remaining "mindful that there is 'no test-related substitute for the exercise of legal judgment.'"  *E.g.*, *O'Connor*, 416 F.3d at 1224 (quoting *Van Orden*, 125 S. Ct. at 2867 (Breyer, J., concurring in the judgment)) (employing the *Lemon* and endorsement test in the context of *McCreary County* and *Van Orden*), *Staley*, 461 F.3d at 508 n.6 (same); *Skoros*, 437 F.3d at 16-18 (same); *ACLU of Ky. v. Mercer County*, 432 F.3d 624, 634-66 (6th Cir. 2005) (same); *cf. Utah Gospel Mission*, 425 F.3d at 1259-61 (applying the *Lemon* and endorsement tests without reference to *McCreary County* or *Van Orden*); *Vision Church*, 2006 WL 3197659, at *13 (applying the *Lemon* and endorsement tests without reference to *Van Orden*).

secular purpose." *Skoros v. City of New York*, 437 F.3d 1, 19-20 (2d Cir. 2006) (quoting *McCreary County*, 125 S. Ct. at 2735).

When there is no evidence of the original purpose for adopting a practice, the government may propose possible secular justifications for the challenged practice. *King v. Richmond Co.*, 331 F.3d 1271, 1277 (11th Cir. 2003). While the government "has the obligation to propose a secular justification for the challenged practice . . . . [t]his does not mean . . . that the government fails the purpose prong in cases in which there is no available evidence of the original intent for adopting a practice." *Id.*

### B. Effect.

Effect considers "whether a reasonable observer aware of the history and context" underlying a particular claim would conclude that it "had the effect of favoring or disfavoring a certain religion." *See id.* at 1227-28 (citing *Bauchman*, 132 F.3d at 551-52). The Court "must consider not only whether the government is actually acting neutrally, but also whether a reasonable observer, reasonably informed as to the relevant circumstances, would *perceive* the government to be acting neutrally." *Utah Gospel Mission*, 425 F.3d at 1260 (emphasis added) (internal quotation marks and citation omitted).

A government display or policy has the effect of endorsing religion where it is "fair to say that the *government itself* has advanced religion through its own activities and influence." *Utah Gospel Mission*, 425 F.3d at 1260 (emphasis in original) (internal quotation marks and citation omitted). And, notably, the effect prong does *not* query "whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the government] endorses religion." *Capitol Square Review &*

29

*Advisory Bd. v. Pinette,* 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (emphasis in original) (internal quotation marks and citation omitted).  A reasonable observer is, at all times, the lodestar of the effect prong.

### C.   Reasonable Observer.

The identity of the "reasonable observer" - "whose perceptions determine whether the government acts with a purpose and effect that violates the Establishment Clause" - is, therefore, critical.  *See Skoros*, 437 F.3d at 23; *O'Connor*, 416 F.3d at 1227-28.  The Tenth Circuit provided post-*McCreary County* and *Van Orden* guidance in *O'Connor v. Washburn University*.  *O'Connor*, 416 F.3d at 1227-31.

In *O'Connor*, the Tenth Circuit considered whether a statue, selected as part of an outdoor art exhibit at a municipal university, disparaged, or "denigrat[ed] the Catholic religion" in violation of the Establishment Clause.  *See  id*. at 1225.  In analyzing the display, the court did so from the perspective of a reasonable observer with extensive knowledge of the sculpture's "context and content."  *Id.* at 1222, 1227-31; *accord McCreary County*, 125 S. Ct. at 2736-37 (rejecting the notion that the objective observer is "absentminded," noting "the world is not made brand new every morning").  Indeed, in upholding the artwork's constitutionality, the Tenth Circuit noted:

> The reasonable observer of [the sculpture] would . . . be aware that the statue was one of thirty outdoor sculptures displayed on the Washburn campus, of which several were located within sight of the challenged display.  In addition, the existence of a brochure available in the campus art museum describing and mapping all the statues on campus would make it clear to a reasonable observer that the statues were part of a unified exhibit.  The reasonable observer would also be aware that art in previous years had been placed at the location of [the sculpture], and that previous exhibitions had included at least one statue with religious symbolism.

*O'Connor*, 416 F.3d at 1228.  Hence, this individual is "presumed to be *familiar* with the history of

the government's actions" and, further, "competent *to learn* what history has to show."[20]  *McCreary County*, 125 S. Ct. at 2737 (emphasis added); *see O'Connor*, 416 F.3d at 1228 (the "awareness of this reasonable observer is not limited to 'the information gleaned simply from viewing the challenged display'" (quoting *Wells v. City & County of Denver*, 257 F.3d 1132, 1142-43 (10th Cir. 2001)).

Where, as here, an Establishment Clause challenge arises out of the elementary and primary school context, "special concerns arise in the identification of a reasonable observer."  *See Skoros*, 437 F.3d at 30; *see id*. at 31 n.26 (observing that "the Supreme Court has noted that Establishment Clause analysis can yield different results depending on whether challenged conduct occurs within a public school or in some other setting" (collecting cases)); *see, e.g., Lee v. Weisman*, 505 U.S. 577, 592-93 (1992) (distinguishing "'mature adults" from "primary and secondary school children" and noting, in the context of school-sponsored religious activities, minors' impressionability); *Stone v. Graham*, 449 U.S. 39, 42 (1980) (implicitly recognizing school students' impressionability); *see generally* Amar, *supra*, at 44-45 (noting that "the incorporation of the establishment clause [sic] first arose in a school case . . . and has had its most visible - if problematic - impact in public schools" (citing *Everson*, 330 U.S. at 1)).  Plaintiff maintains that the "reasonable observer" for assessing the legality of the challenged practices is a child.  (Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 76] 7.)  However, notwithstanding the fact that Plaintiff's claims arise out of the public schools setting, it is clear that the reasonable observer is an adult.

_____

[20]The Court understands the profile of the "reasonable observer" to be identical for the purpose and effect prongs of the *Lemon*-endorsement analysis.  *Skoros*, 437 F.3d at 23 n.20 ("There appears to be no difference in the Supreme Court's characterization of an 'objective observer' and a 'reasonable observer' at the first two stages of *Lemon* analysis." (citations omitted)).  In *McCreary County*, the Supreme Court considered the "context and content" of the challenged display in reference to the purpose analysis.  *McCreary County*, 125 S. Ct. at 2734-37.  By contrast, the *O'Connor* court addressed the contour of the "reasonable observer" under the *Lemon*-endorsement test's effect analysis after finding the defendant had a "predominate purpose" in selecting and displaying the sculpture at issue.  *See O'Connor*, 416 F.3d at 1225 n.2.

Put simply, "young schoolchildren cannot satisfy the[] requirements" of the Supreme Court's reasonable observer.  *See Skoros*, 437 F.3d at 24; *see, e.g.*, *McCreary County*, 125 S. Ct. at 2737 (presuming a reasonable observer of keen awareness of a particular display's history); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 34-44 (2004) (O'Connor, J., concurring in the judgment) (suggesting, albeit tacitly, that the reasonable observer is an adult, in the context of a primary school Establishment Clause challenge); *Capitol Square Review & Advisory Bd.*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) (noting that the "'history and ubiquity' of a practice is relevant" (citation omitted)); *see also Summum v. City of Ogden*, 297 F.3d 995, 1010 (10th Cir. 2002) ("our consideration of the *Lemon* factors demands sensitivity to any "coercive pressure" imposed upon the relevant community on account of the challenged policy"); *but cf*. *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308 (applying the endorsement test through the eyes of "an objective Santa Fe High School student").  Accordingly, the Court casts an adult in this role "who, in taking full account of the policy's text, history, and implementation, does so mindful that" the challenged practices arise in the primary and secondary public school context.  *See Skoros*, 437 F.3d at 23 (finding school children to be the primary audience for the holiday display at issue); *O'Connor*, 426 F.3d at 1228 ("reasonable observer" profiled as having broad and significant familiarity with the content and context, including the history and implementation, of the challenged practice).

### D.   Entanglement.

Entanglement, "*Lemon*'s final prong," mandates "that a challenged governmental action 'must not foster an *excessive* government entanglement with religion.'"  *Utah Gospel Mission*, 425 F.3d at 1261 (emphasis added) (quoting *Lemon*, 403 U.S. at 613).  Of course, "[t]otal separation between

church and state is not possible in an absolute sense." *Id.* Contacts between the government and religion are only impermissible, therefore, if they are so extensive that they have "the effect of advancing or inhibiting religion." *Agostini v. Felton,* 521 U.S. 203, 233 (1997). Therein, the court "'must examine the character and purposes of the institutions that are benefitted, the nature of the aid that the [government] provides, and the resulting relationship between the government and the religious authority.'" *Utah Gospel Mission*, 425 F.3d at 1261 (quoting *Lemon*, 406 U.S. at 615).

## VI.   The Parties' Cross Motions for Summary Judgment.

### A.      Defendants' Motion for Summary Judgment.

For the reasons stated herein, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's emblem claim. Regarding the sculpture and Policy #424 claims, however, even reading Plaintiff's submissions broadly[21] and with the benefit of all favorable inferences, Defendants' summary judgment motion is well-taken.

Before reaching the merits, the Court is compelled to address a preliminary issue. Defendants claim that the crosses featured on LCPS property - including the maintenance-vehicle emblem and the Sports Complex sculpture - are "not . . . religious in nature" because they represent the Las Cruces community's name and, thus, the crosses carry no religious message. (*See, e.g.*, Defs.' Resp. Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 81] 5.) Defendants' position is, at best, "disingenuous." *Friedman v. Bd. of County Comm'rs of Bernalillo County*, 781 F.2d 777, 782 (1985) (en banc).

_____

[21]Plaintiff is proceeding as a *pro se* litigant in the case at bar. As such, his motion will be "construed liberally." *Hall v. Belmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (noting that the *Haines v. Kerner*, 519 U.S. 519 (1972), rule "applies to all proceedings involving a *pro se* litigant"). Yet, the court's broad reading of Plaintiff's motion papers is not without limits. Clearly, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant." *Id.*

The Latin cross - like the Ten Commandments at issue in *McCreary* and *Van Orden* - is undeniably religious.  *Van Orden*, 125 S. Ct. at 2863 (plurality opinion) (Rehnquist, J.) ("Of course, the Ten Commandments are religious--they were so viewed at their inception and so remain."); *accord Friedman*, 781 F.2d at 782 ("The religious significance of the cross . . . is undisputed."). Indeed, it is "one of the most sacred of religious symbols."  *See Capitol Square Review & Advisory Bd.*, 515 U.S. at 771 (Thomas, J., concurring).  Clearly, Plaintiff is correct that the three crosses incorporated in the sculpture have "religious significance."  *Van Orden*, 125 S. Ct. at 2863; *accord Robinson*, 68 F.3d at 1231 n.9 (recognizing that "a Latin cross" is "a very familiar religious symbol"). The Court expressly rejects Defendants' position to the contrary.

   1.   **The Emblem.**

Defendants move for summary judgment on Plaintiff's emblem claim.  They contend that the emblem, affixed to Defendants' public school maintenance vehicles: (1) "has [a] secular purpose"; (2) does not "have a principal or primary effect of advocating or endorsing religion"; and (3) implicates "no excessive entanglement."  (Defs.' Mot. Summ. J. [Doc. 32] 6-8 (emphasis omitted).) Defendants submit that the challenged "three crosses" emblem is used for the secular purpose of identifying its maintenance vehicles as belonging to LCPS.  (Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 8; Defs.' Mot. Summ. J. [Doc. 32] 6-8.)  They explain that the inclusion of three crosses in the emblem's design is "hardly surprising" since Las Cruces, "translated into English," means "the crosses" (Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 8; *see also, e.g.*, Martinez Dep. 13:16-17), and that "[t]he use of crosses to represent the city and community of Las Cruces is quite common and well known."  (Schutz Dep. 27:7-17.)

Plaintiff contends that Defendants' display of the emblem is motivated by an improper

religious purpose.  First, Plaintiff argues that it is not clear that "Las Cruces" means "the crosses" in Spanish.  (*See* Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 4.)  Second, he notes that Defendants have not presented any evidence to "support the hearsay comments provided by depositions of school district employees" regarding the emblem's origin and history.[22]  (Pl.'s Ct.-Ordered Br. [Doc. 116] 5.)  Plaintiff avers that, notwithstanding Defendants' stated purpose, the religious symbolism of the crosses predominates.  (*E.g.*, Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 14 (noting similarities between challenged emblem and  "similar[]" emblems used by, *inter alia*, Mesilla Valley Christian School and Las Cruces Catholic School to "denote property" owned by those institutions).)  Additionally, Plaintiff argues that Defendants purported secular purpose is not genuine, given that LCPS uses multiple emblems.  While it continues to identify its maintenance vehicle with the emblem challenged here, it uses another emblem - that does not feature obviously religious symbols - on its stationary, official documents, and the main LCPS administration building.[23] (Pl.'s Ct.-Ordered Br. [Doc. 116]  6 & Ex. 2; *see* Defs.' Supplemental Resp. Pl.'s Req. Produc. No. 15 [Doc. 25] (purchase order of 9/03/03 for 100 vehicle emblems); Schutz Aff. ¶ 3-4.)

Undoubtedly, as a general matter, Defendants' stated secular purpose - i.e., identifying their maintenance vehicles as belonging to LCPS - is legitimate.  *E.g.*, *Friedman*, 781 F.2d at 780 n.3 (declining to "explicitly reject" the defendant's stated secular purpose for the challenged city seal,

---

[22]The Court finds that this statement - especially reading pro se Plaintiff's briefing liberally - preserved Plaintiff's Rule 56(e) objection.  (*Compare* Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 2 (noting that Wilson's testimony "regarding the use of the emblem was hearsay), *with id.* (indicating "no opposition" to Defendants' statement that the emblem's origin "is unknown").)

[23]Plaintiff evidenced that LCPS' other logo does not feature crosses; it depicts a "modified ZIA-sun symbol," an adobe structure, a hill, two cacti, and the words "Las Cruces Public Schools."  (Pl.'s Ct.-Ordered Br. [Doc. 116] Ex. 2; Schutz Aff. ¶ 3 ("symbol adopted as a result of a student art contest in the early 1990's").)

namely: "county identification"). But because there are "limits to the display of religious messages or symbols," the Court must assess whether Defendants' proffered purpose is genuine. *See Van Orden*, 125 S. Ct. at 2863 (plurality opinion) (citations omitted). After *McCreary County*, it is clear that this Court should not defer to Defendants' stated purpose without careful consideration. *See McCreary County*, 125 S. Ct. at 2735; *O'Connor*, 416 F.3d at 1225-27. As noted above, to assess its constitutionality, this Court must "examine the history of the [emblem's use] . . . in an attempt to determine whether [Defendants'] 'ostensible and predominant purpose' in displaying" the emblem is to endorse the Christian religion. *Id.* at 1225 (quoting *McCreary County*, 125 S. Ct. at 2733).

Upon exhaustive review of the record at bar - and despite the Court's repeated entreaties for further factual development over the course of this litigation's three year pendency - the Court is unable to determine whether Defendants "predominate" purpose regarding the emblem is secular. Unlike the facts before the *O'Connor* court, for example, the record here does not contain *any* admissible evidence regarding why, when, or by whom the emblem was first adopted by Defendants.[24] *Compare, e.g., McCreary County*, 125 S. Ct. at 2739 (tracing the history of the challenged display in detail, including when, why, and by whom the display was enacted by the defendant state actor), *and Van Orden*, 125 S. Ct. at 2858 (same), *and O'Connor*, 416 F.3d at 1225-27 (same), *with* (Pretrial Order[Doc. 139] 6 ("Since the early 1960's [LCPS'] maintenance vehicles have used a distinctive emblem on the sides of those vehicles.").)

---

[24]Ralph Wilson's (LCPS' former Physical Plant Director) deposition testimony provides the only information regarding the emblem's origins. (Wilson Dep. 10:1-7.) In pertinent part, Wilson testified that:

> Q. [Plaintiff Weinbaum] When did [LCPS] start putting [the emblem] . . . on the doors of the vehicles?
>
> A. I'm not positive about that. To the best of my knowledge, it was in the '60s, early '60s. And that's just hearsay from people that I've talked to that have been there forever.

(*Id.*) Even if this testimony would suffice for summary judgment purposes, quite clearly, it is not admissible evidence. *See* Fed. R. Evid. 802.

Nor is there any evidence that such information does not exist. True, former LCPS Superintendent Martinez stated that, "[b]ased on [his] research of the [LCPS] maintenance vehicle emblem," he was "not able to determine the origin of the emblem other than it has been used since the early [19]60s." (Martinez Aff. ¶ 6.)  Significantly, however, neither Defendants' briefing, nor other record evidence, states what Defendant Martinez's "research" entailed. To the contrary, the record provides no information about Defendants' efforts to trace the emblem's origins and use by LCPS. *Cf., e.g.*, *Robinson*, 68 F.3d at 1228 ("The seal was first adopted in 1965 following a competition sponsored by the City Council and a local newspaper. A local resident, Frances Bryan, designed the seal from her two winning entries. Since 1965, the seal has been used extensively by the City"). Consequently, the inquisitive, "reasonable observer" identified by the Tenth Circuit in *O'Connor* is left to wonder - as is this Court - about the emblem's history. *See O'Connor*, 416 F.3d at 1228-29; *see supra* Part V.C. Given that the Court is obligated to verify that Defendants' stated secular purpose is "genuine, not a sham, and not merely secondary to a religious objective," Martinez's statement is not enough. *McCreary County*, 125 S. Ct. at 2735; *see also id.* 2741 ("purpose needs to be taken seriously under the Establishment Clause and needs to be understood in the light of context"); *Friedman*, 781 F.2d at 780 n.3 ("all courts must be wary of accepting after-the-fact justifications for government officials in lieu of genuinely considered and recorded reasons for actions challenged on Establishment Clause grounds").

The Court, of course, recognizes the possibility that evidence regarding the circumstances of Defendants' adoption of the emblem no longer exists. And, going forward, should it be evidenced that the emblem's origins are unknown that would *not* mean that Defendants cannot satisfy the purpose prong. *See, e.g.*, *McCreary County*, 125 S. Ct. at 2735 (noting that "Establishment Clause

analysis does not look to the veiled psyche of government officers" and that, if government actors' religious motive is not apparent to the objective observer, then, "without something more," the "government does not make a divisive announcement that in itself amounts to taking religious sides"); *Friedman*, 781 F.2d at 780 n.3 (declining to find that Defendant failed to satisfy the "purpose prong" even though "there was no evidence of the county's purpose for originally adopting the seal").

But this is summary judgment and Fed. R. Civ. P. 56 squarely places the burden on the moving party. *See supra* Part IV. That burden has not been met.

On the record before it today, the Court's Establishment Clause analysis regarding the emblem need not go any further.[25]  *See Soc'y of Separationists*, 416 F.3d at 1241; *Foremaster*, 882 F.2d at 1492. Viewing the evidence in its entirety, and drawing "inferences therefrom in the light most favorable" to Plaintiff, "the nonmoving party," the Court finds that a genuine issue of material fact, regarding Defendants purpose, remains. *See Grace United Methodist Church*, 451 F.3d at 649. Accordingly, Defendants' summary judgment motion will be denied as to Plaintiff's emblem claim. *See* Fed. R. Civ. P. 56(c).

## 2.     The Sculpture.

Defendants also move for summary judgment on Plaintiff's claim that Defendants' "purchase" and "placement" of the Sports Complex sculpture is unconstitutional.[26]  (Pretrial Order [Doc. 139]

_____

[25]The Court believes it significant that Defendants have not - notwithstanding Defendant Martinez's undetailed and uncorroborated claim that his "research" did not reveal "the origin of the emblem" - indicated that information regarding when, why, and by whom does not exist (e.g., the record contains no sworn statement that Defendants, after good-faith review of their records and speaking to available sources, believe that this information has been lost over the years).

[26]The Court notes that Plaintiff made several allegations that the Court need not address, namely, that the sculpture: (1) features "two Omega symbols," which are "associated with Christianity"; and (2) symbolizes - given that the exterior, mild steel circle is "broken" in two places - Christ's disciples, three of whom made up his "inner" circle (depicted by the three-twelfths portion of the sculpture's steel circle) and his "outer" circle (depicted by the

6.)  Defendants argue that the Sports Complex sculpture serves a secular purpose, that it does not have the effect of endorsing religion, because a reasonable observer would understand the sculpture to "represent[] Las Cruces," and that it does not cause excessive entanglement.  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 9.)  Defendants' motion is well taken.

### a.   Purpose.

### i.   The Selection of the Sculpture.

The record contains no evidence that the sculpture's selection was motivated by Defendants' desire to endorse or advance Christianity.   John Schutz (LCPS Visual and Performing Arts Coordinator and a member of the LCS that selected the sculpture) stated under oath that religion was "[a]t no time . . . discussed or [otherwise] . . . involved in the [LCS] selection of Ms. Bird's art work [sic]."  (Schutz Aff. ¶ 7.)  Bird denied ever being "contacted by anyone in the school system or [NM Arts]" regarding her design or being required to "use vertical beams or crosses" in her sculpture.  (Bird. Aff. ¶ 9.)  Indeed, the uncontroverted record evidence reveals that: (1) the artist's design, featuring three crosses, was not influenced, or otherwise encouraged by, Defendants or the LCS; and (2) religion played no part in the sculpture's selection.

Defendants maintain that the sculpture selection was motivated by three secular purposes: (1) "beautify[ing] the [Sports] [C]omplex"; (2) "standing as a monument to the 'pursuit of excellence'"; and (3) "embody[ing] the spirit of Las Cruces in doing these things."  (Defs.' Supplemental Mem.

---

remaining "nine-twelfths" of the circle).   (Pl.'s Ct.-Ordered Br. [Doc. 116] 4,6.)  There is no record evidence supporting any of these claims, nor do Plaintiff's assertions appear in the Pretrial Order filed after Plaintiff made these assertions.  (*See* Pretrial Order [Doc. 139].)  This Court's "inherent authority . . . to manage its own docket includes the discretion to determine which claims to consider."  *Sipp v. Unumprovident Corp.*, 107 F. App'x 867, 875 (10th Cir. 2004) (citing *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 985 (10th Cir. 2002)); *R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987) ("A pretrial order, then, is the result of a process in which counsel define the issues of fact and law to be decided at trial, and it binds counsel to that definition."), *cited in Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000).

Supp. Mot. Summ. J. [Doc. 69] 12.)  These rationales are consistent with Prospectus # 155, the May 31, 2003 LCPS News Release describing the sculpture, as well as LCS-member Schutz's statements. (Schutz Dep. 31:3-32:1-19; Schutz Aff. ¶ 6-7.)    The genuineness of these purposes is further corroborated by the fact that the winning proposal expressly states that the artist's project was intended to emphasize Las Cruces' "strength in unity as a community," as well as its "commitment to excellence."[27]  (Bird. Aff. Ex. E.)  Notably, because "there is no evidence of improper motive," Defendants' first purported purpose for the artwork - beautification of the Sports Complex - is, therefore, "permissible."  *See O'Connor*, 416 F.3d at 1226; *cf. Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 493-96 (7th Cir. 2000) (campus beautification inadequate secular purpose for fifteen-foot statue of Jesus Christ where there was some evidence that the government's purpose was religiously motivated).

Plaintiff, however, maintains that Defendants' purpose in selecting and positioning the sculpture, in fact, was to endorse Christianity.  (*See* Pretrial Order [139] 6.)  He reasons that the following factors would lead "some to believe that [selecting and displaying the sculpture communicated] an underlying preference towards the Christian religion": (1) all members of the Las Cruces School Board are Christian; (2) Bird "stated that the three crosses were meant to represent all Las Crucens"; (3) Bird "was raised Catholic"; and (4) in itself, Defendants' assertion that the three crosses represent "all Las Crucens" demonstrates an impermissible purpose. (*See* Pl.'s Resp. Defs.'

_____

[27]Further bolstering the conclusion that Defendant did not select the sculpture for an improper motive is that the proposal ultimately selected comported with Prospectus # 155's requirements.  (*Compare* Bird Aff. Ex. B (Prospectus # 155), *with id*. Ex. C (Bird's resume, references, and ten slides of previous artwork), *and id*. Ex. E (Bird's proposal).)  Likewise, this tends to detract from the significance of another fact Plaintiff underscores: the other two proposals selected as finalists for Prospectus # 155 by the LCS did not incorporate any obviously religious symbols in their designs.  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. O [Doc. 37] (proposals submitted by the two Prospectus # 155 finalists not selected by the LCS).)

Mem. Supp. Summ. J. [Doc.37] 16.)  Plaintiff's arguments are unavailing.

First, Plaintiff misstates the reasonable observer standard.  The endorsement test does not look to whether "*some*" Las Crucens believe that Defendants' purpose in displaying the sculpture is to endorse Christianity.  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc.37] 16.)  Rather, as discussed at length above, *see supra* Part V.C., Establishment Clause jurisprudence dictates that, "The eyes that look to purpose belong to an *objective* observer."[28]  *McCreary County*, 125 S. Ct. at 2734 (emphasis added) (internal quotation marks and citation omitted); *accord Skoros*, 437 F.3d at 24 (noting that "the reasonable objective observer standard" is "subject to criticism" but that, like other aspects of *Lemon*: "until the Supreme Court rules otherwise, we are not free to discard or recast the reasonable objective observer test"); *O'Connor*, 416 F.3d at 1224 (same).  Here, a reasonable observer - "aware of the history and context of the forum" - would understand that crosses are commonly and widely used in the Las Cruces community to symbolize the community's name.  *See O'Connor*, 416 F.3d at 1227-28.

Second, Plaintiff failed to demonstrate how the School Board members' respective religion is material to Defendants' purpose in selecting and displaying the sculpture.  In any case, it is clear that: (1) religion was never discussed by the LCS in its decision to select Bird's sculpture; and (2) the artist testified that the design was hers alone.  (Bird Dep.11:1-25.)

Third, Plaintiff's arguments regarding the artist's intent and religious faith are misplaced.  In *O'Connor*, the Tenth Circuit made clear that the "purpose prong of the endorsement test focuses on

---

[28]As noted herein, the Court finds that there is no evidence that Defendants' purpose regarding the Sports Complex sculpture was illegitimate.  Accordingly, here, as in *O'Connor*, the sculpture's "context and content" is most "relevant to the effect of the display" and will be addressed in the Court's effect-prong analysis.  *O'Connor*, 416 F.3d at 1225 n.2.  For the reasons stated there, the Sports Complex sculpture's "context and content . . . do not suggest that [Defendants'] . . . predominant purpose in displaying the [art]work" was to promote the Christian religion.  *See id.*

the intent of the government actor in displaying a particular work of art, not on the intent of the artist in creating the work." *O'Connor*, 416 F.3d at 1225 n.3 (citation omitted).  In any event, Plaintiff produced no evidence that the sculpture's creator - Bird - intended the artwork to communicate a pro-Christianity message. *See id.*  To the contrary, Bird stated that the "sculpture has nothing to do with promoting religion" (Bird. Aff. ¶ 9) and that she did not, in any event, "see the three crosses as representing Jesus or the Crucifixion of Jesus." (Bird Dep. 30:8-10.)  In her proposal submitted to the LCS, Bird explained that the design included three crosses to "represent the diverse cross-section of our community."[29]  (Bird Aff. Ex. E (Bird Proposal) (noting that the single cross beam represents the community's "singleness of purpose": the "pursuit of excellence").)

Fourth, contrary to Plaintiff's position, Defendants' position that the sculpture - including its three crosses  - represents the Las Cruces community as a whole, does not, per se, evidence an improper purpose.  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 9.); *McCreary County*, 125 S. Ct. at 2734 (noting that the purpose prong turns on an "*objective* observer['s]" perceptions (emphasis added) (internal quotation marks and citation omitted)).   An objective observer here would understand that the LCS, and for that matter the artist, intended the crosses to represent Las Crucens in their secular sense.  That observer - well aware that three crosses commonly are used in Las Cruces to identify the community - might also perceive that the sculpture's crosses represent Las Cruces, which "means 'The Crosses' in Spanish and has significance to the area, including LCPS."[30] (Pretrial

---

[29]Plaintiff's suggestion that Bird's sculpture was religiously motivated is further undermined by the artist's deposition testimony where she stated that, although she was "raised Catholic," she no longer "ha[s] a religion."  (Bird Dep. 6:11-16.)

[30]Likewise, Plaintiff's contention that other, "more secular images that could reflect the stated theme of 'Pursuit of Excellence'" is misplaced.  (Compl. [Doc.1] ¶ 36.)  This position seemingly attacks the effectiveness of Defendants' "chosen methods . . . of achieving its goal[]."  *O'Connor*, 416 F.3d at 1226.  It is well settled, however, that whether Bird's sculpture was "the most effective possible means of achieving" Defendants' aim -

Order [Doc. 139] 7.)

## ii.     The Display and Scale of the Sculpture.

The LCS decision to place Bird's sculpture on the Sports Complex's southern-most outer wall does not evidence any impermissible purpose on Defendants' part.  Prospectus # 155 expressly stated that it was seeking artwork specifically for the precise location where the sculpture is installed.  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. L ("The LCS wishes to commission . . . artwork designed to be placed on or near an exterior wall on the south side of the new [LCPS] Sports Complex stadium.").)  It described the location as "an area of high visibility," "accessible to the public," and adjacent to Tashiro Road.  (*Id.*)  In any case, the location for the artwork ultimately selected under Prospectus # 155 was determined when the competition was announced.

Likewise, the sculpture's large scale is consistent with Prospectus # 155.  *See supra* Part II.B.2.  Specifically, the prospectus directed that: "The proposed artwork needs to be monumental in scale and easily seen from a distance of 40 feet."  (Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. L.)  Hence, neither the sculpture's location nor size evidences an improper motive on Defendants' behalf.

Finally, the installation and wording of the larger plaque accompanying the sculpture demands further mention.[31]  Although the sculpture was dedicated on May 21, 2003, the plaque was installed March 31, 2004, some seven months after Plaintiff filed the instant lawsuit in September 2003. Defendants describe the sign as "a descriptive plaque" that "articulat[es] the artist's creative conception and interpretation of the abstract sculpture."  (Defs.' Resp. Pl.'s Interrog. # 23 [Doc.

---

again, embodying Las Cruces' spirit - is "irrelevant to the question" at hand: whether Defendants' selection of this sculpture was motivated by an impermissible purpose.  *See id.*

[31]The smaller plaque accompanying the sculpture is "required by NM Arts."  (Defs.' Resp. Pl.'s Interrog. # 23 [Doc. 36] (NM Arts mandates that a plaque list the artwork's title, the artist's name, and give recognition to the Art in Public Places Program.))  It was installed in October 2003.  (*Id.*)

36].)  While it echoes the artist's proposal, Defendants concede that the plaque's text is not identical to Bird's narrative.  John Schutz stated that he "created the description of vertical beams and singular crosses as a more exact interpretation of the artwork for the general public."  (Defs.' Resp. Pl.'s Interrog. # 24 [Doc. 36].)

Clearly, the timing of the second plaques' March 2004 installation and the fact that it seems to suggest that it was installed in May 2003 is, at the very least, curious.  As is Schutz's decision to use Bird's own language to a great extent, but to decline, quite plainly, to include the word "crosses" on the plaque.  (*See, e.g.*, Defs.' Resp. Pl.'s Mot. Summ. J. [Doc.46] 6 (stating that "[o]ther than the Artist describing the sculpture [as] representing three crosses and the diverse cultures of Las Cruces, there is no mention of crosses" in arguing that "a reasonable observer would . . . infer . . .that the three "crosses" represented . . . the artist's representation of modernistic sculpture").)

The Court recognizes that, in a different case, a reasonable observer might well question whether this puzzling action by LCPS was evidence of a purpose to endorse.  *Cf. McCreary County*, 125 S. Ct. at 2739-41 (noting that, after defendants were sued, "they modified the [challenged] exhibits and invited additional insight into their purpose," finding that "new statements of purpose were presented only as a litigating position," and that "the selection of posted material" accompanying the exhibits did not "prevail over evidence of the continuing religious object" because a reasonable observer "would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality").  But here, where there is no indication that Defendants' actions were motivated by a desire to endorse religion and Schutz provided a plausible explanation for his actions, the Court does not find that Defendants' actions regarding the plaque undermine the sculpture's

constitutionality.  No doubt, the initiation of this lawsuit caused Defendants angst.  LCPS likely installed the second plaque to clarify LCPS' understanding of the artwork.  That is, of course, within their right.  In any case, the issue simply does not present an issue of *material* fact.  *See Grace United Methodist Church*, 451 F.3d at 649.

In sum, following its "thorough review of the record," the Court finds that there is no record evidence that Defendants selected or displayed the Sports Complex sculpture for the purpose of favoring or endorsing the Christian religion.  *See O'Connor*, 416 F.3d at 1227.  As such, "the evidence in this case is simply insufficient to 'establish that the [sculpture] is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message.'"  *Id*. (quoting *Lynch*, 465 U.S. at 680).

### b.    Effect.

The endorsement test's "effect" analysis probes "whether, irrespective of the government's actual purpose," the challenged display "conveys a message of endorsement."  *Lynch*, 465 U.S. at 690, *quoted in Foremaster*, 882 F.2d at 1491; *see supra* Part V.B.  "'Endorsement' connotes an expression or demonstration of approval or support."  *Capitol Square Review & Advisory Bd*, 515 U.S. at 763 (plurality opinion) (citing *The New Shorter Oxford English Dictionary* 818 (1993); *Webster's New Dictionary* 845 (2d ed. 1950)).  And Supreme Court cases "have accordingly equated 'endorsement' with 'promotion' or 'favoritism.'"  *Id*. (citation omitted).  The endorsement test's effect prong is a "question of law" for the Court; it is determined "without reference to the reactions of individual viewers."  *O'Connor*, 416 F.3d at 1231 n.7 (citing *Bauchman*, 132 F.3d at 555); *accord Capitol Square Review & Advisory Bd*., 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) (explaining that the reasonable observer standard does not ask whether

"a particular viewer of a display might feel uncomfortable"). To pass constitutional muster, the Court must find that the reasonable observer would "perceive [Defendants] to be acting neutrally" toward religion in displaying the Sports Complex sculpture.[32]  *See Utah Gospel Mission*, 425 F.3d at 1260 (internal quotation marks and citation omitted).

Defendants maintain that "the fully informed community viewer . . . would perceive that the sculpture represents Las Cruces" - "not a particular religion or sect" - and that it is "unique" and "artistic."  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 9; Defs.' Reply Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 41] 4.)  Defendants reason that: (1) in Las Cruces, New Mexico, the community's name is widely understood to mean "the crosses" in English; and (2) that "crosses have been used to represent Las Cruces for decades."[33] (Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 9.)

Plaintiff, conversely, maintains that the sculpture's effect is to endorse religion.  Specifically, he argues that: (1) the three Latin crosses incorporated in the sculpture's design are religious symbols that - regardless of any connection to Las Cruces' name - communicate a message of Christian endorsement by Defendants; (2) Las Cruces' meaning in English is, at minimum, unsettled; and (3) using three crosses to symbolize the Las Cruces community is a practice that is without historical significance.  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 17.)

---

[32]Hence, Plaintiff's evidence regarding two individuals' - who he describes as "reasonable observers" - statements regarding the three crosses' significance is legally irrelevant.  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 16-17; Pl.'s Mem. Supp. Summ. J. [Doc. 39] Ex. H ("Letters to the Editor").)  The "reasonable observer" standard controls this Court's Establishment Clause analysis and does not consider individual Las Crucens' perceptions of the challenged practices.  *See Capitol Square Review & Advisory Bd.*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) (noting the "fundamental difficulty in focusing on actual people" at the effect prong).

[33]Defendants also claim that "an overwhelming majority of Las Cruces residents speak Spanish."  (Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 9.)  As this bare allegation is not corroborated by any record evidence, and is not mentioned in the Pretrial Order, the Court will not entertain this contention.  *See supra* note 26.

46

As previously noted, Latin crosses have obvious and profound religious significance, *see supra* Parts III.A., VI.A., and the Supreme Court has recognized that symbols can have both religious *and* secular meaning.[34]   *Van Orden*, 125 S. Ct. at 2863 ("Of course, the Ten Commandments are religious . . . [but they also] have an undeniable historical meaning").   Further, it is well-established that government-sponsored artwork that incorporates a religious symbol does not necessarily convey "'a message of *endorsement* or disapproval.'"   *Skoros*, 437 F.3d at 47 (emphasis added) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)); *accord Van Orden*, 125 S. Ct. at 2863 (plurality opinion); *cf. O'Connor*, 416 F.3d at 1228 (challenged artwork, "one of thirty outdoor sculptures," was displayed as "part of a 'typical museum setting'").

Yet, Plaintiff argues that this case is controlled by a number of cases in which government displays incorporating the Latin cross have been struck down as unconstitutional.   (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 9 (citing, *inter alia*, *Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995); *Friedman*, 781 F.2d at 777; *Harris v. City of Zion*, 927 F.2d 1401 (7th Cir. 1991); *Webb v. City of Republic*, 55 F. Supp. 2d 994 (W.D. Mo. 1999); *ACLU of Ohio v. City of Stow*, 29 F. Supp. 2d 845 (N.D. Ohio 1998)).)   In all the cases relied upon by Plaintiff, the issue presented was whether a "government seal or logo containing an unmistakably religious image violates the Establishment Clause."   *E.g.*, *Robinson*, 68 F.3d at 1228 ("The circular seal contains four quadrants, of which [three depict secular symbols] . . . and the last quadrant depicts a Christian cross."); *Friedman*, 781 F.2d at 779 & n.1 ("The circular seal . . . contains the phrases, 'Bernalillo County,'

---

[34]As already noted, this Court expressly rejects Defendants' position that the sculpture's "design is not religious in any way."  Likewise, the Court will not address Defendants' arguments related to this contention, including that the Sports Complex sculpture is wholly distinguishable for this reason from the "overtly religious" display upheld in *Van Orden*.  (Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 13.)  The sculpture incorporates crosses - "stylized," as they may be - and, thus, it clearly communicates a religious message.

and 'State of New Mexico' . . . [and] the Spanish motto, 'CON ESTA VENCEMOS,' which translates into English as, 'With This We Conquer,' or 'With This We Overcome,' [that] arches over a golden latin [sic] cross, highlighted . . . . The cross occupies roughly half the seal . . . .").   In each case, the defendants' arguments that the cross simply represented the communities' Christian heritage or history were squarely rejected.  *E.g.*, *Robinson*, 68 F.3d at 1232 (rejecting defendants' argument that "the City seal is permissible because it symbolizes "the unique history and heritage of Edmond"); *Friedman*, 781 F.2d at 779, 782 (reversing district court's finding that "the significance of the sheep and cross was solely historical").

The Court finds these cases readily distinguishable from the case at bar.  Las Cruces' name, quite simply, sets this case apart from all those cited by Plaintiff.  A reasonable observer of the sculpture - affixed to the LCPS Sports Complex - would understand the crosses incorporated in the artwork symbolically represent this uniquely named geopolitical subdivision, rather than an endorsement of Christianity.  *Cf. Robinson*, 68 F.3d at 1227 (challenge to City of Edmond, Oklahoma's official seal); *Harris*, 927 F.2d at 1402 (challenge to City of Rolling Meadows, Illinois's official seal and City of Zion, Illinois' official seal, logo, and emblem); *Friedman*, 781 F.3d at 779 (challenge to Bernalillo County, New Mexico's official seal); *Webb*, 55 F. Supp. 2d at 995 (challenge to City of Republic, Missouri's official seal); *ACLU of Ohio*, 29 F. Supp. 2d at 846 (challenge to City of Stow's official seal).

Our case is more analogous to *Murray v. City of Austin*.  *Murray v. City of Austin*, 947 F.2d 147 (5th Cir.1991).  In *Murray*, the Court of Appeals for the Fifth Circuit found the City of Austin, Texas' official logo to be constitutional, notwithstanding its inclusion of a Latin cross.  *Id*. at 149. The *Murray* court's decision turned on the fact that the Austin logo was modeled after "the family

48

coat of arms of Stephen F. Austin, the 'father of Texas' and the person after whom the City is named." *Id*. Austin's familial coat of arms contained a Latin cross. *Id*. In holding that the logo did not have the effect of endorsing religion, the Fifth Circuit found that "the insignia has the principal or primary effect of identifying city activity and property and promoting Austin's unique role and history." *Id*. at 155.

As in *Murray* - where the "connection between the state of Texas, the city of Austin, and Stephen F. Austin is unparalleled" - the connection between Las Cruces and three crosses is "unparalleled." *See Webb*, 55 F. Supp. 2d at 1000 (construing *Murray*); *accord Robinson*, 68 F.3d at 1232 (same). And, in both *Murray* and this case, the name of the city drove the adoption of the contested symbol: No further deliberation would have been required, nor implied, in choosing the symbol, which literally reflects the name. Conversely, in *Robinson*, *Friedman*, and *Harris*, the local governing bodies necessarily made choices unrelated to the name of the entity itself as to what symbols (or seals) would represent their city or county. In making those decisions, in exercising that discretion, the governing bodies revealed attitudes and beliefs which impermissibly crossed the establishment line. Additionally, the different outcomes in *Murray*, versus, for instance, *Robinson*, *Friedman*, and *Harris*, further underscore that "factual specifics and context are nearly everything when it comes to applying the Establishment Clause to religious symbols and displays." *Glassroth v. Moore*, 335 F.3d 1282, 1300 (11th Cir. 2003).

Further, a reasonable observer would be sensitive to the Sports Complex sculpture's "particular physical setting" in assessing its effect. *O'Connor*, 416 F.3d at 1228 (citing *Lynch*, 465 U.S. at 671, 681-82). Plaintiff argues that a reasonable observer would perceive that the state endorsed the sculpture's religious significance for the following reasons: (1) because the crosses are

made of "highly reflective" stainless steel, making them the most "prominent feature of the artwork";
(2) the sculpture's large size and location make it readily visible from Tashiro Road, the heavily-
traveled side street some forty feet from the artwork.[35]  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J.
[Doc. 37] 17; *see also* Pl.'s Mem. Supp. Summ. J. [Doc. 39] 3.)  Plaintiff is "correct that these
factors weigh toward a finding of state endorsement."  *See O'Connor*, 416 F.3d at 1228.  But,
because a reasonable observer would be ""aware of the . . . forum' in which the [sculpture] appears,"
they would - in any case - also be aware of several other aspects of the Sports Complex.  *Id.* (quoting
*Santa Fe Indep. Sch. Dist.*, 530 U.S. at 317).  These factors make clear that the sculpture does not
have the effect of endorsing Christianity.

First, the Sports Complex is quite obviously publically owned and designated for the public
schools' use.  *Cf. Bauchman*, 132 F.3d at 555 (reasonable observer would be aware that "the Choir
represents one of Salt Lake City's *public* high schools and is comprised of a diverse group of
students" (emphasis added)).  In Las Cruces, a reasonable observer would find this pivotal to the
meaning of the crosses incorporated in the Sports Complex sculpture.

Second, a reasonable observer would also notice that, although the sculpture is clearly visible
from Tashiro Road, it is not readily accessible to the public.  It is located inside a secured, locked area

---

[35]Plaintiff's argument regarding the significance of the sculpture's text is not supported by record
evidence.  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 17 (arguing that it is significant that the sculpture's
text is in Latin because, while it is not understood by the average viewer, the Latin language is widely associated
"with the liturgy and history of the Catholic Church").)  Conversely, Defendants' evidenced why Latin text was
used by the artist.  (*Compare* Bird Dep. 11:17-19 ("I imagined - in the prospectus they wanted text, and I imagined
something in Latin like the motto for the Olympics."), *and id.* Ex. E ("The words [on the sculpture] are in Latin
because it is the universal language of athletic competition."), *with* Schutz Dep. 31:24-32:1-4 (stating that Bird is
"[t]echnically . . . correct" that Latin is the "universal language" of athletic competition).)  Further, they stated that
neither the artist nor the LCS "that chose the sculpture contemplate[d] any religious meaning" in the use of Latin
text on the artwork.  (Defs.' Resp. Pl.'s Supplemental Mem. Supp. Summ. J. [Doc.81] 5, 11 (noting that, besides
the Catholic Church, "Latin is also associated with many other traditions, including Roman mythology"); Schutz
Aff. ¶ 7.)

of the Sports Complex; there is no footpath or other means to readily access the sculpture. Significantly, while it is adjacent to Tashiro Road, there is no designated place to view the artwork (e.g., there is no vehicle pullout or pedestrian sidewalk to facilitate viewing the artwork).  Simply put, the sculpture is not situated such that the public is required to encounter it accessing the Sports Complex; its location is hardly prominent.[36]  *Cf. O'Connor*, 416 F.3d at 1228 (statue located "next to a footpath at a prominent location on campus, in an area reserved for official use"); *Van Orden*, 125 S. Ct. at 2858 ("The monolith challenged here stands 6-feet high and 3 1/2 -feet wide.  It is located to the north of the Capitol building, between the Capitol and the Supreme Court building.").

Third, the sculpture is accompanied by two plaques, situated directly adjacent to Tashiro Road.  The smaller plaque makes clear that: (1) the display is a sculpture - i.e., a piece of art - created by Bird; and (2) it is entitled "Unity, Strength, Excellence."  *See infra* app. B.  The larger plaque explains that, notwithstanding the obvious connection between the crosses and Las Cruces' name, the Sports Complex sculpture's crosses signify the community's diversity and "commitment to excellence."  *Id.*  Additionally, it makes clear that the artwork incorporates a variety of purely secular themes (e.g., the "pursuit of excellence").  *Cf. Bauchman*, 132 F.3d at 555 (finding it significant that while "many of the Choir's songs have religious content . . . in contrast to a church choir, this Choir

---

[36]The passive nature of the Sports Complex sculpture, combined with its non-central location, are significant given the Supreme Court's views on "the importance to many students of attending and participating in extracurricular activities as part of a complete educational experience."  *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 311 (holding unconstitutional policy allowing student-led prayer prior to public high school football games); *cf. Lee*, 505 U.S. at 595 (holding unconstitutional policy allowing clergy-led prayers during public school's graduation) ("Law reaches past formalism.  And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme."); (*see also* Pl.'s Ct.-Ordered Br. [Doc. 116] 13 (underscoring the compulsory nature of education in New Mexico and alleging, without evidence or further elaboration, that LCPS students are "forced to view the . . . . religious message" - presumably of the sculpture - "during school-sponsored field trips to public facilities").)  Also, the Court reiterates that it disagrees with Plaintiff that the artwork's location is prominent.  *Compare supra* Part I.B.2., *with County of Allegheny*, 492 U.S. at 598 n.48 (finding that by locating a display, which incorporated religious symbols, in a "prominent location distinct from any other decorations," state unconstitutionally endorsed religion).

also performs a variety of secular songs"); *Ams. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538-40 (6th Cir. 1992) (en banc) (upholding display of "20-foot high steel menorah in [the "principal public plaza in the area"] . . . during the eight days of the Jewish holiday of Chanukah" where defendant required sculpture "be accompanied by two signs disclaiming defendant's "endorsement . . . of the organization or the display").

These facts, taken together, would - as in *O'Connor* and *Bauchman* - "lead the reasonable observer to conclude that the state did not intend to endorse a particular religious message."[37] *O'Connor*, 416 F.3d at 1229 (citations omitted); *Bauchman*, 132 F.3d at 555 (same); *see generally Van Orden*, 125 S. Ct. at 2876 (Stevens, J., dissenting) (recognizing that "a religious symbol may at times become an important feature of a familiar landscape or a reminder of an important event in the history of a community."). A reasonable observer would not see the Sports Complex sculpture as a state-sponsored endorsement of Christianity. *See O'Connor*, 416 F.3d at 1231 ("Ultimately, this court need not determine the proper interpretation of [the sculpture]. Regardless of whether the statute sends an anti-Catholic message, any reasonable observer viewing it in context would understand the [defendant] had not endorsed that message."); *Bauchman*, 132 F.3d at 555 (endorsement test requires plaintiff to "allege facts indicating" the challenged practices "have a *principle* or *primary* effect of advancing or endorsing religion" (emphasis in original)).

    **c.**    **Entanglement.**

"*Lemon*'s final prong provides that a challenged governmental action 'must not foster an

---

[37]Plaintiff's insistence that the fact that the Sports Complex is used by elementary and secondary school students does not undermine this conclusion. The Tenth Circuit is clear that the "Establishment Clause . . . does not compel the removal of religious themes from public education." *O'Connor*, 416 F.3d at 1230; *accord Bauchman*, 132 F.3d at 555 ("United States Supreme Court precedent 'plainly contemplate[s] that on occasion some advancement of religion will result from governmental action.'" (quoting *Lynch*, 465 U.S. at 683)).

excessive government entanglement with religion.'" *Utah Gospel Mission*, 425 F.3d at 1261 (quoting *Lemon*, 403 U.S. at 613 ).  Defendants maintain that the selection and display of the Sports Complex sculpture "amounts to [a] . . . religiously neutral choice."  (Defs.' Mem. Supp. Summ. J. [Doc. 33] 9.)  Plaintiff maintains that "[t]here is excessive entanglement" here, because the sculpture is very "similar to . . . symbols used by religious organizations."  (Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] 17.)

In *Bauchman*, the Tenth Circuit noted that "[t]he entanglement analysis typically is applied to circumstances in which the state is involving itself with a recognized religious activity or institution."  *Bauchman*, 132 F.3d at 556 (citation omitted).  Notably, having rejected "[plaintiff's] allegations . . . that [the] defendants' conduct endorse[d] religion," the *Bauchman* court found that:

> a reasonable observer would conclude the selection of religious songs from a body of choral music predominated by songs with religious themes and text, and the selection of public performance venues affiliated with religious institutions, without more, amount to religiously neutral educational choices.  Consequently, we perceive no state involvement with recognized religious activity.

*Id*.

Likewise, having found that the Sports Complex sculpture survived the effect analysis, the Court finds that a reasonable observer would also find the selection and display of the sculpture amounted to "religiously neutral" choices.  *See id*.  There is simply no evidence indicating any involvement between Defendants and any religious activity or entity.  *See id*.

Accordingly, Defendants did not violate the Establishment Clause by selecting and displaying the Sports Complex sculpture.  Defendant is entitled to summary judgment on this claim.  *See generally Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 476 (2d Cir. 1999) (recognizing that the Supreme Court's jurisprudence dictates that: "when courts adjudicate claims that some

governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance"); *Ams. United for Separation of Church & State*, 980 F.2d at 1544 (upholding private, seasonal display of menorah in public forum) ("Even if this display appears similar in some respects to others that have been found unconstitutional in the past, other factors, unique to this case, may *require* us to uphold the [defendant's] decision" (emphasis added)).

### 3. Policy

Defendants move for summary judgment claiming that Policy # 424: (1) "sets forth the Supreme Court test in *Lemon*"; (2) "requires objectivity," "explicitly prohibits teaching . . . [that] promote a religious doctrine," and "seeks to prevent the establishment of religion"; and (3) "is applied in a correct and lawful manner within [LCPS]." (Defs.' Mem. Supp. Summ. J. [Doc. 33] 10; Defs.' Supplemental Mem. Supp. Mot. Summ. J. [Doc. 69] 16 (emphasis omitted).)  Plaintiff, however, alleges that LCPS' Policy # 424 "condones the advancement of the teachings of a singular religion in the public schools." (Pretrial Order [Doc. 139] 4, 6.)  Further, he maintains that it provides "no safeguards" to prevent Defendants from violating the Establishment Clause.  (*See id.*)  Defendants' motion is well taken in part.

### a. Facial challenge.

The Supreme Court, in addressing Establishment Clause challenges to public school policies involving religion, has repeatedly stated that: "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"  *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302 (quoting *Lee*, 505 U.S. at 587).  At

the same time, the high court has "consistently held" that the government does not violate the Establishment Clause by "enact[ing] neutral policies that happen to benefit religion." *Capitol Square Review & Advisory Bd*, 515 U.S. at 764 (plurality opinion) (citations omitted); *id*. at 768 (citations omitted) ("policies providing incidental benefits to religion do not contravene the Establishment Clause").

This principle extends with equal force to public schools.  Indeed, the Tenth Circuit has expressly stated that: "there is a legitimate time, manner and place for the discussion of religion in the public classroom." *Bauchman*, 132 F.3d at 554 (citing *Schempp*, 374 U.S. at 225, and *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1315-16 (8th Cir. 1980)).  The Supreme Court has gone further: "it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization." *Schempp*, 374 U.S. at 225.  Hence, the "study of religion is not forbidden 'when presented objectively as part of a secular program of education.'" *Florey*, 619 F.2d at 1315 (quoting *Schempp*, 374 U.S. at 225).

The Court finds that Policy # 424 is, consistent with Supreme Court and Tenth Circuit precedent, a facially neutral policy.[38]  In pertinent  part, the policy's "Religion in the Curriculum" section provides that:

> Instructional activities addressing religion should meet the three-part test established by the Supreme Court to determine constitutionality.
> a. The activity must have a secular purpose.
> b. The activity's principal or primary effect must be one that neither advances nor inhibits religion.
> c. The activity must not foster an excessive governmental entanglement with religion.

(Defs.' Mem. Supp. Summ. J. [Doc. 33] Ex. D.)  *Cf., e.g., Santa Fe Indep. Sch. Dist.*, 530 U.S. at

---

[38]The policy, in its entirety, is attached as Appendix C.  *See infra* app. C.

306, 309 (noting that, despite defendant's stated secular purposes for the policy at issue, the policy's text clearly endorsed a religious message).  Further, Policy # 424 permits the display of religious symbols as follows:

> C. RELIGIOUS SYMBOLS
> Definition: A religious symbol is any object which portrays or represents a religious belief. A religious symbol can also be an object which is so closely associated with religion(s) or with the celebration of a religious holiday that it is commonly perceived as being of a religious nature.
>         1. Religious symbols may be displayed or used as a teaching resource provided no effort is made to impose any particular beliefs which may be associated with such symbols. They may be used as examples of a culture and/or a specific religious heritage.
>         2. Whenever appropriate, teachers are encouraged in their presentations to expose students to symbols and traditions from a variety of cultures.
>         3. Religious symbols may be displayed for show-and-tell or reports or class discussions as long as their appearance is volunteered by the students and as long as the symbols are removed from display upon completion of the report or discussion.

(Defs.' Mem. Supp. Summ. J. [Doc. 33] Ex. D.)

First, the policy accurately recites the *Lemon* test, which is "the traditional standard used for analysis of Establishment Clause claims" employed by the Tenth Circuit.  *Utah Gospel Mission*, 425 F.3d at 1258-59 (applying the three-part *Lemon* test to resolve Establishment Clause challenge).  As such, Policy # 424 facially comports with the Establishment Clause's insistence that LCPS neither advance nor inhibit religion.  *Cf. Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 759 (7th Cir. 2001) (Posner, J.) ("The government's interest in providing a stimulating, well-rounded education would be crippled by attempting to accommodate every parent's hostility to books inconsistent with their religious beliefs.").

Second, the policy - without exception - is consistent with the "concept of neutrality" embodied by the Establishment Clause.  *Schempp*, 374 U.S. at 225; *see also, e.g. Good News Club*

*v. Milford Cent. Sch.,* 533 U.S. 98, 114 (2001) ("[The] guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." (internal quotation marks and citation omitted)).  Contrary to Plaintiff's position, the Court finds that the Policy # 424 provides LCPS personnel with clear guidance on the permissible use of, *inter alia,* religion in the curriculum and religious symbols.  *See infra* app. C.

Further, "whatever significance" elementary school students' impressionability has in Establishment Clause jurisprudence, it is clear that Policy # 424's insistence on neutrality assuages these concerns.  *Good News Club,* 533 U.S. at 115; *cf. Santa Fe Indep. Sch. Dist.,* 530 U.S. at 306 (striking down public-school policy allowing prayer at football games: "the policy, by its terms, invites and encourages religious messages"); *Lee,* 503 U.S. at 587 (striking down public-school policy permitting clergy-led prayer at high school graduation: policy sanctioned "a state-sponsored and state-directed religious exercise in a public school").  Because Defendants' policy does "not actually advanc[e] religion, the impressionability of students would [not] be relevant to the Establishment Clause issue."  *Child Evangelism Fellowship of Md., Inc. v.  Montgomery County Pub. Sch.,* 373 F.3d 589, 595 (4th Cir. 2004) (citing *Good News Club,* 533 U.S. at 115-16).  Policy # 424 is facially constitutional.

### b.    "As applied" challenge.

In his Complaint, Plaintiff alleges that Defendants' "blatant violations of [Policy # 424] . . . illustrate[] the need for specific guidelines" and that the "current policy on religion is insufficient . .

. to prevent violation of the Establishment Clause."[39]  (Compl. ¶ 38-39.)  Of course, the "actual or perceived endorsement of [Policy # 424's] message . . . is established by factors beyond just the text of the policy."  *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 307.  Defendants cannot enact a facially permissible policy, such as Policy # 424, "but, on an ad hoc basis with no standards to guide it, choose one religious group" or faith to, for instance, "erect a display while denying all other groups permission to erect displays."  *Cf. Am. Jewish Congress v. City of Beverly Hills*, 90 F.3d 379, 384 (9th Cir. 1996) (striking down city's permitting process "allowing private unattended displays in its parks" because it lacked "clear standards" and, thus, "allow[ed] for arbitrary application").

To the extent that Plaintiff claims Policy # 424 is unconstitutional as applied to the maintenance vehicle emblem, the Court will withhold its decision pending trial on the constitutionality of that symbol.  *See supra* Part VI.A.1.  At the same time, for reasons discussed above, the Court finds that Policy # 424 is constitutional as applied to the Sports Complex sculpture.  *See supra* Part VI.A.2.

Plaintiff also seems to claim that Policy # 424 is unconstitutional as applied to a permanent tile project, featuring three crosses, at LCPS' Booker T. Washington Elementary School ("BTW").[40] While it has never been a free-standing claim, Plaintiff has repeatedly cited the display  as a "clear violation" of Policy # 424 Section C ("Religious Symbols").  (*E.g.*, Pl.'s Resp. Answer [Doc. 6] 4-5,

---

[39]The precise nature of Plaintiff's challenge to Policy # 424 is not entirely clear.  That is, it is ambiguous from the Pretrial Order, as well as his briefing papers, whether in addition to his facial challenge, Plaintiff claims that Policy # 424 is unconstitutional "as applied."  In light of Plaintiff's pro se status and the affirmative relief he seeks, the Court will consider his claim to be both.  (*See* Pretrial Order [Doc. 139] 6.)

[40]Photos of the BTW display are attached as Appendix D.  *See infra* app. D.  Former-Plaintiff Jesse Chavez expressed, in communication with Defendant Martinez, his belief that the BTW display does not violate the Establishment Clause.  (Pl.'s Mem. Mot. Summ. J. [Doc.39] Ex. B (Ltr. from Chavez to Martinez of 6/5/03).) Plaintiff Weinbaum is not bound by, and clearly he does not agree with, that concession.  (Pretrial Order [Doc. 139] 6.)

Ex. A (photos of maintenance-vehicle emblem, Sports Complex sculpture, and BTW display); Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc.37] 6, 18; *see also* Pretrial Order [139] 6 ("Defendants have condoned the permanent placement of multiple Latin crosses in at least one public school.").)

But the record contains only scant information about the BTW tile project. Plaintiff submitted that the project is "permanent" and that it was not clearly "student initiated." (*Id.* 5.) From photos submitted by Plaintiff, it appears that the tile project: (1) is several feet tall and affixed to an interior wall; (2) features three adjacent decorated tiles that depict chile peppers, three crosses, and a yucca plant, respectively, with the Organ Mountains forming the background of each; (3) is obviously artwork; and (4) was designed by children or designed to look that way. (*E.g.*, Pl.'s Resp. Answer [Doc. 6] Ex. A.) Notably, the parties' briefing papers never squarely addressed the constitutionality of this display. Nor was the display's history, context, or precise physical features factually developed. Nevertheless, as noted, the issue remains lurking. (Pretrial Order [Doc. 139] 6.) Simply put, the record is inadequate to analyze the constitutionality of the BTW display as prescribed by the Supreme Court and Tenth Circuit. *E.g.*, *Capitol Square Review & Advisory Bd.*, 515 U.S. at 766 (plurality opinion) ("giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause").

Mindful that Plaintiff is proceeding pro se and that this is summary judgment, the Court concludes that to rule on this issue would be premature. Additional factual development, as outlined above, is needed. Accordingly, the Court will deny Defendants' summary judgment motion regarding the Booker T. Washington display. In all other regards, however, Plaintiff's "as applied" challenge

to Policy # 424's constitutionality is rejected and Defendants' motion is granted.[41]   *See, e.g.,*

*Linnemeir*, 260 F.3d at 759-60 (Posner, J.) ("If an Establishment Clause violation arose each time

a student believed that a school practice either advanced or disapproved of a religion, school curricula

would be reduced to the lowest common denominator, permitting each student to become a

'curriculum review committee' unto himself . . . . Academic freedom and states' rights, alike demand

deference to educational judgments that are not invidious" (internal quotation marks and citations

omitted)).

---

[41]The Court acknowledges that, over the course of this litigation, Plaintiff articulated a number of other allegations that, liberally construed, could be characterized "as applied" challenges to Policy # 424.  (*E.g.*, Pl.'s Resp. Order to Show Cause [Doc. 141]5-6 (alleging LCPS and City of Las Cruces improperly exposed students to three crosses symbols featured on 2006 National Bicycle Week literature, school yearbook, graduation program, and on Southern New Mexico State Fair Exhibit); Pl.'s Ct.-Ordered Br. [Doc. 116] 6 (alleging that LCPS' other emblem - which features a "modified State of New Mexico Zia symbol" - is "religiously inspired"), *id.* (alleging that Las Cruces School Board "coordinated with the City of Las Cruces to have police [whose uniforms feature a patch that includes three Latin crosses] park their vehicles marked with Latin crosses in prominent places at schools"); Pl.'s Reply Defs.' Resp. Pl.'s Interrog. # 13 [Doc. 36] (alleging, without evidence or further elaboration, that Las Cruces High School students were "required to buy and read the New Testament Bible," Sierra Middle School's "Honors English required reading list" included a "cultural disparagement book," Lynn Middle School incident involving a pro-life advocate); Pl.'s Resp. Defs.' Mem. Supp. Summ. J. [Doc. 37] Ex. S (documenting Sept. 2002 Lynn Middle School incident).)  But, unlike Plaintiff's BTW allegations, which have been lurking from the very beginning of this litigation, these other allegations are not referenced or alluded to in the Pretrial Order. *See supra* note 26 (pretrial order controls the litigation from the date it is filed).  As such, even giving the benefit of all favorable inferences due Plaintiff as a pro se litigant, these allegations do not warrant consideration and, in any case, cannot withstand Defendants' summary judgment motion.  *See supra* note 26.

Further, the Court notes that Plaintiff argues that a District of New Mexico ruling in *Duffy v. Las Cruces Public Schools*, 557 F. Supp. 1013 (D.N.M. 1983) demonstrates that "LPCS has a significant history of ignoring the Establishment Clause," thus, evidencing that "Policy # 424 is inadequate."  (Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 76] 10.)  Defendant maintains that the decision "has no bearing on this case whatsoever."  (Defs.' Resp. Pl.'s Supplemental Mem. Supp. Summ. J. [Doc. 81] 12.)  In *Duffy*, the court struck down a state statute and LCPS School Board policy permitting school prayer.  *Duffy*, 557 F. Supp. at 1014.  The Court does not find this twenty-three year old ruling material to the constitutionality of Policy # 424.  *See infra* app. C (indicating that the current version of Policy # 424 was enacted in 1999).

**B.      Plaintiff's Motion for Summary Judgment.**

Having treated Defendants' summary judgment motion, Plaintiff's Motion for Summary Judgment is denied *ipso facto* with respect to his arguments regarding the Sports Complex sculpture and his facial challenge to Policy # 424.  *See supra* Part VI.A.2., A.3.i.  As discussed at length, *see supra* Part VI.A.1., A.3.ii., genuine issues of material fact remain regarding the LCPS maintenance vehicle emblem and Policy # 424 as applied to the BTW tile display.  *Grace United Methodist Church*, 451 F.3d at 649 (citing Fed. R. Civ. P. 56(c)); *Munoz*, 221 F.3d at 1164 (noting that the moving party shoulders "the initial burden to show that there is an *absence* of evidence to support the nonmoving party's case" (emphasis added)).  Accordingly, Plaintiff's motion will be denied.

**VII.    Conclusion.**

 The constitutional issues raised in this case are "issues of acute public interest-issues which evoke diverse opinions and strong emotions."  *Bauchman*, 132 F.2d at 545.  All the more so in this divisive context, "[w]e take seriously our obligation to uphold the First Amendment of the Constitution, which fundamentally operates to protect minority interests."  *Id*.

The issues raised by Plaintiff are some of the most divisive of this, or any, time.  The Court is also mindful that a suit of this nature "puts nothing in a plaintiff's pocket and can take a great deal out, and . . . the risk of social ostracism can be powerfully deterrent."  *Van Orden*, 125 S. Ct. 2897 (Souter, J., dissenting).

In the Las Cruces newspapers during the pendency of this litigation, Mr. Weinbaum has been the subject of several letters to the editor and comments in the "Sound Off" column.  Many of those letters and comments have gone beyond critical to downright mean.  People have suggested that if Mr. Weinbaum has these complaints about the community, he should leave.  No, he should not.  This

is the United States of America.  As a father and a citizen, Mr. Weinbaum has every right to raise his concerns in this Court.

The beauty of the system of governance passed down by the Founders is that Mr. Weinbaum does not have to leave, that the complaint of someone in the minority can and should be heard, and that we are all better for the hearing.  In the hearing, we grow as a people and as a Nation.  We can and should develop a deeper appreciation for our diversity.  We can come to understand that one man's symbol of hope and resurrection power may be, to another, something else entirely.  We can be awakened to the notion that the respect and dignity we owe each of our neighbors should not depend on a conforming belief system.

Before leaving the Supreme Court, Justice O'Connor challenged us all as follows:

[T]he goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society.  By enforcing the Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat.  At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate . . . .  Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?

*McCreary County*, 125 S. Ct. at 2746 (2005) (O'Connor, J., concurring).

Mr. Weinbaum, a man of conviction, brought this suit, hoping to make his community, a better, more welcoming, place.  Sadly, it has come to the Court's attention that the opposite has occurred, that his child has been made to suffer for the position her father has taken.  If that is true or, if, as a result of this decision it comes true, then shame on us all.

WHEREFORE,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 32), filed on May 14, 2004, is **GRANTED in part and DENIED in part**, and Plaintiff's Motion for Summary Judgment (Doc. 38), filed on June 4, 2004, is **DENIED.**

**IT IS SO ORDERED**.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**