## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| PAUL F. WEINBAUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CV 03-1043 RB/LAM |
| | ) | |
| LAS CRUCES PUBLIC SCHOOLS, | ) | |
| CHARLES DAVIS, LEONEL BRISENO, | ) | |
| GENE GANT, JOHN SCHWEBKE, | ) | |
| SHARON WOODEN, as School Board Members | ) | |
| of Las Cruces Public Schools, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION

**THIS MATTER** comes before the Court on the parties' Stipulation of Facts (Doc. 166), filed November 17, 2006, Plaintiff's Findings of Fact and Conclusions of Law (Doc. 163), filed November 16, 2006, and Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 167), filed November 17, 2006, and a trial on November 27, 2006. Pursuant to Rule 52, the Court herein sets forth its Findings of Fact, Conclusions of Law, and its decision. Because the Court finds that Las Cruces' name is widely understood in the community to mean "the crosses," and that the Establishment Clause's strictures are otherwise satisfied, judgment, in favor of Defendants, shall be entered. *See O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1231 (10th Cir. 2005).

## I.       INTRODUCTION.

This case concerns whether - in Las Cruces, New Mexico - the Establishment Clause allows the display of three Latin crosses on public school property.  *See* U.S. Const. amends. I, XIV. Following this Court's November 9, 2006 Memorandum Opinion and Order (Doc. 152), only two issues remained unresolved.  Namely, whether an emblem affixed to Las Cruces Public School ("LCPS") maintenance-school vehicles and LCPS Policy # 424, as applied to the emblem and a permanent mural displayed inside Booker T. Elementary School ("BTW"), are unconstitutional.

On November 27, 2006, the Court held a bench trial on the remaining issues.  Plaintiff (Paul F. Weinbaum) proceeded pro se; attorney William Babington represented Defendants (Las Cruces Public Schools, et al.).  Having heard witness testimony, reviewed the parties' exhibits accepted into evidence at trial, heard Plaintiff's and defense counsel's respective arguments, and reviewed the trial pleadings and relevant law, the Court makes the following Findings of Fact and Conclusions of Law.[1] *See* Fed. R. Civ. P. 52(a).

## II.      FINDINGS OF FACT.

1.       Plaintiff Paul F. Weinbaum is a New Mexico resident and taxpayer, who lives within the boundaries of the Las Cruces Public Schools ("LCPS").  Plaintiff Weinbaum has a child enrolled in a LCPS school.

2.       Defendant LCPS is a governmental entity created by statute and governed by an elected School Board.

---

[1]Because Plaintiff proceeded as a *pro se* litigant in the case at bar, his arguments and filings will be "construed liberally."  *Hall v. Belmon*, 935 F.2d 1106, 1110 & n.3 (10th Cir. 1991) (noting that the *Haines v. Kerner*, 404 U.S. 519 (1972), rule "applies to all proceedings involving a *pro se* litigant").  Yet, the court's broad reading of Plaintiff's position is not without limits.  Clearly, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant."  *Id.* at 1110.

3.      LCPS is the second largest school district in New Mexico that encompasses, *inter loci*, the City of Las Cruces.

4.      Defendants Davis, Briseno, Gant, Schwebke, and Wooden are Las Cruces School Board Members ("Board Members") who, together with the LCPS Superintendent, are responsible for creating and enforcing LCPS school policies within the law.

5.      Defendant Board Members are sued in their official capacity.

6.      The Christian or Latin cross is an immediately recognizable symbol for most of Christianity.[2]

7.      For Christians, the cross is the most powerful symbol of their faith - the symbolic representation of redemption and of the atoning death of Jesus Christ.

8.      For many others, the cross has, sadly, been a symbol of oppression, persecution, and sometimes death.

9.      From the New Testament gospels of Matthew, Mark, and Luke, "three crosses"--one Latin cross, slightly taller than the crosses to the right and left of it--have come to symbolize the crucifixion of Jesus, along with two criminals, at Calvary.

10.     "Las Cruces" is Spanish for "the crosses."

11.     In 1849, Pablo Melendres, the mayordomo of Doña Ana, a village about fifteen miles to the north of present-day Las Cruces, New Mexico, asked the United States Army to help relieve overcrowding in his community.

12.     In response to Melendres' request, Lt. Delos Sackett laid out and founded *El Pueblo del Jardin de Las Cruces*, which translates as "the City of the Garden of the Crosses," which is

---

[2]The Court herein incorporates by reference its more lengthy findings regarding the Latin cross and Las Cruces, New Mexico's origins, *see infra*, set forth in its November 9, 2006 Memorandum Opinion and Order. (Mem. Op. & Order [Doc. 152] 17-25.)

known today as the City of Las Cruces.

13.     There are at least two theories regarding the origin of the City of Las Cruces' name.

14.     One theory suggests that the name means "the crossroads," originating from the intersection of the Chihuahua Trail and the Butterfield Overland Mail Route near Las Cruces.

15.     This theory lacks support: the Butterfield Overland Mail Route began service through the area in the 1850s, only after the village of *El Pueblo del Jardin de Las Cruces* was founded.

16.     The more reliable, and widely held, theory holds that the name, Las Cruces, described groups of crosses placed on graves and the sites of massacres that occurred in the area between 1712 and 1840.

17.     During the Spanish colonial and Mexican periods, most travelers and settlers in the area were Catholic and crosses were used to mark graves or locations of massacres.

18.     A 1847 first-hand account corroborates that crosses were seen in the area, which would, two years later, become *El Pueblo del Jardin de Las Cruces*,[3] today known simply as Las Cruces.

19.     Despite lingering ambiguity surrounding the name's historical origins, it is clear that Las Cruces means "The Crosses."

20.     The plural of both *cruz* (cross) and *cruce* (crossing) is *cruces*, but the potential for confusion dissipates when the gender of the respective nouns is considered.  All nouns in Spanish have either masculine or feminine gender, except for one or two nouns of undecided gender.  *Cruz* is a feminine noun, the plural of which, accompanied by its definite article (which must agree in case and gender with the noun modified) is rendered <u>*las cruces*</u>, while *cruce* is a masculine

---

[3] Spanish speakers will recognize that "*jardin de las cruces*," garden of the crosses, may well be a euphemism for a cemetery, lending further support for the notion that the name *Las Cruces* means "the crosses."

noun, the plural of which, accompanied by its definite article, is rendered _los cruces_.

21. Plaintiff concedes that "the crosses" is a possible translation of "Las Cruces."

22. Plaintiff does not object to City of Las Cruces' name, due to its historical character.

23. The City of Las Cruces has long used crosses in its official insignia: the earliest documented use of three crosses in an official symbol of Las Cruces consists of a lease agreement between the Town of Las Cruces and Mrs. A.L. Sweet, dated July 28, 1941.

24. The cover of the City's 1963-64 Annual Report included several images illustrating city services and a symbol consisting of three crosses surrounded by a sunburst; the 1965 Annual Report's cover employed a slightly different version of the three-crosses-in-a-sunburst symbol.

25. A number of non-religious public and private entities in Las Cruces use three crosses to identify themselves as local entities.

### A.      Maintenance-vehicle emblem.

26. Since at least 1969, LCPS has marked its maintenance vehicles with an emblem that features a sunburst with three Latin crosses.[4]

27. LCPS owns approximately thirty-five maintenance vehicles.

28. The emblem's diameter is 12 inches.

29. At the center of the emblem, a blue sunburst is depicted. Inside the sunburst, there is a white circle containing three, centered, blue crosses. The white circle's diameter is 1.875 inches; the three crosses are not equal in size. The largest cross is centered and flanked, on either side, by the two remaining crosses, which are equal in size.

---

[4]Photos of the emblem are attached as Appendix A. _See infra_ app. A.

30.     Encircling this symbol are two separate blue bands containing text.  Immediately surrounding

the center symbol is a blue band with thin, white, capital-letter text that reads: "FOR

OFFICIAL USE ONLY."   The first two words appear above the sunburst containing the

crosses; the latter two words are situated below.   The exterior blue band features larger

capital-letter text that reads: "LAS CRUCES PUBLIC SCHOOLS."   Like the arrangement

of the "for official use only" text, the exterior band features the words "Las Cruces" above

the sunburst containing the crosses and "public schools" below.

31.     The emblem is very similar to the logo used by the City of Las Cruces on its 1965 Annual

Report; both images' designs incorporate three crosses placed inside a sunburst.

32.     The emblem is used by LCPS exclusively on its maintenance vehicles; no other LCPS vehicles

bear the emblem.

33.     The emblem identifies the LCPS maintenance vehicles as being affiliated with LCPS'

maintenance department and, thus, properly on LCPS school grounds.

34.     Unauthorized vehicles on school property are a student-safety concern.

35.     The emblem's origin - namely, when, by whom, and why it was designed - remains unknown,

despite the significant research efforts of LCPS personnel and graduate students employed

by Dr. Hunner.[5]

36.     Having examined the emblem's available history exhaustively, the Court concludes that the

emblem: (1) was most likely adopted in the 1960s, at the behest of Luitt Miller, a former

---

[5]Jon Hunner, Ph.D, Associate Professor and Director of the Public History Program at New Mexico State
University, was appointed to serve as an expert witness on the history of Las Cruces, including the historical
context of the name, "Las Cruces," and the use of crosses within the community of Las Cruces.  *See* Fed. R. Evid.
706; (Defs.' Ex. A (Hunner Report).).

Associate LCPS Superintendent/Former Physical Plant Director, to make vehicles readily identifiable to LCPS personnel; and (2) has been, and continues to be, used for this purpose.

37.     LCPS uses another emblem - that does not feature obviously religious symbols - on its stationary, official documents, and the main LCPS administration building; that symbol was adopted long after the emblem was first placed on LCPS maintenance vehicles.

38.     The sunburst, itself, conveys no religious meaning.

39.     The emblem has not been used to proselytize Plaintiff's daughter or anyone else.

40.     LCPS uses a logo, other than the emblem at issue here, on its administration building.  LCPS adopted the logo at the time LCPS administration relocated to its current location in Las Cruces.  The logo is affixed to the exterior of that building; it was adopted in the 1990s following a student design contest.  However peculiar it is that LCPS uses multiple symbols, there is no evidence that Defendants' stated secular purpose for the maintenance-vehicle emblem is, in any way, insincere.

**B.     Policy # 424.**

41.     LCPS Policy # 424 is one of many policies that govern the school system.

42.     Policy # 424 provides guidance to LCPS employees on the topic of religion in schools.[6]

43.     Policy # 424 is designed to ensure LCPS' compliance with the law.

44.     Policy # 424, "Religion in the Curriculum," provides, in applicable part, that:

Instructional activities addressing religion should meet the three-part test established by the Supreme Court to determine constitutionality.
         a. The activity must have a secular purpose.
         b. The activity's principal or primary effect must be one that neither advances nor inhibits religion.

---

[6]The policy, in its entirety, is attached as Appendix B.  *See infra* app. B.

c. The activity must not foster an excessive governmental entanglement with religion.

45. Policy # 424, Section C permits the display of religious symbols, as follows:

C. RELIGIOUS SYMBOLS

Definition: A religious symbol is any object which portrays or represents a religious belief. A religious symbol can also be an object which is so closely associated with religion(s) or with the celebration of a religious holiday that it is commonly perceived as being of a religious nature.

1. Religious symbols may be displayed or used as a teaching resource provided no effort is made to impose any particular beliefs which may be associated with such symbols. They may be used as examples of a culture and/or a specific religious heritage.

2. Whenever appropriate, teachers are encouraged in their presentations to expose students to symbols and traditions from a variety of cultures.

3. Religious symbols may be displayed for show-and-tell or reports or class discussions as long as their appearance is volunteered by the students and as long as the symbols are removed from display upon completion of the report or discussion.

46. Between 1998 and 2000, the U.S. Department of Education ("DOE") 21st Century Community Learning Centers program, in partnership with LCPS, funded several educational projects. The program encourages projects that have, *inter alia*, an arts-education component.

47. The 21st Century Community Learning Centers program awards federal grants to specific school districts nationwide. It requires the local school districts to administer and control the grants. John Schutz, former LCPS Coordinator for Visual and Performing Arts, served as the fiscal control agent for LCPS' 21st Century Community Learning Centers grant.

48. One of the projects funded by the DOE initiative was a mural that is on permanent display at BTW in Las Cruces.[7]

---

[7]Photos of the BTW mural are attached as Appendix C. *See infra* app. C.

49.     The mural was created by BTW students enrolled in the Court Youth Center's Safe After School Program.  Court Youth Center ("CYC") is a non-profit organization that runs a number of programs to serve Las Cruces youth.

50.     The mural is a piece of public, student artwork, created with the assistance of visual artist Ken Wolverton.  Most of the children who participated in the mural project were third, fourth, and fifth grade students.

51.     Wolverton is an established artist-of-note who lives in northern New Mexico.  His role in the project was to facilitate the students' ideas and help create the artwork; he did not generate the artwork's design.

52.     The mural's design originated with BTW students involved in the CYC after-school program, not Wolverton.

53.     There is no evidence that the crosses featured in the mural were intended to convey a message endorsing the Christian faith.

54.     The mural came about through the following process: (1) Wolverton explained to the CYC students what public art is and what murals are; (2) Wolverton led a brain-storming process in which students decided on what types of images they wished to include in the mural and what types of materials they wished to use; (3) the students decided to create a ceramic mural, where the mural would be displayed, and the artwork's scale; (4) the students drew pictures to be incorporated in the mural; (5) Wolverton helped the students make a symmetrical collage out of the students' drawings; (6) Wolverton built a "mockup"; (7) the students painted the tiles.

55.     The mural consists of five panels.  The mural's center panel depicts three crosses.  The panel

9

immediately to its left depicts chile and chile fields, which are common in the Las Cruces vicinity.  The panel immediately to the center panel's right depicts a yucca plant.  All three panels feature drawings of the Organ Mountains - located just east of Las Cruces - in the background.  The mural's far left end panel shows a child holding a book.  The mural's far right end panel features a drawing of Booker T. Washington.

56.    All of the images incorporated in the mural are consistent with either the Las Cruces area's geography, culture, and history, or BTW.

57.    There is no evidence that any principle, besides symmetry, directed Wolverton's arrangement of the students' drawings (i.e., the placement of the tile featuring the three crosses in the artwork's center).

58.    After the mural was installed, a commemorative plaque was installed adjacent to the artwork. The plaque features, in large bold text, Booker T. Washington's name on its first line.  Next, a quote from Booker T. Washington, in English and Spanish, appears.  The plaque then notes that the mural: "was created by the students in the [CYC]'s Safe After School Program with the visual artist Ken Wolverton" and was "[f]unded by [DOE] 21st Century Community Learning Center in partnership with [LCPS]."  Finally, the plaque identifies the BTW principal, the lead teacher, Mary Ryan, and includes the date: May 2000.  (*See infra* app. C.)

59.    The mural is apparently prominently displayed at BTW; the location was selected by BTW children.  There is no evidence that Wolverton or LCPS personnel coerced or otherwise precipitated this decision.  The mural's location was selected by BTW students *before* they designed the artwork.

60.    Although the plaque is dated May 2000, it is unclear: (1) when the mural was installed; (2)

10

whether a dedication ceremony was held; or (3) when the plaque was installed.

61.   The mural was completed and installed sometime between 1998 and 2002.

62.   There is no evidence that the plaque was installed as part of Defendants' litigation strategy following this Court's November 9, 2006 Memorandum Opinion and Order denying Defendants' summary judgment motion as to the mural.

63.   The mural's design did not require School District approval.

64.   Wolverton and Margaret Ryan, the project's Lead Teacher, were subject to Policy #424.

65.   Wolverton and Ryan provided site-based management and oversight of the mural created by the BTW students and facilitated by Wolverton.  CYC personnel provided an additional layer of supervision.

66.   CYC, BTW, or other LCPS personnel never discussed whether the BTW mural conformed to Policy # 424 prior to, or following, its installation.

## III.   CONCLUSIONS OF LAW.

1.   Jurisdiction arises under 28 U.S.C. § 1331 (2000).

2.   Plaintiff brought this case pursuant to 42 U.S.C. § 1983 (2000), alleging, *inter alia*, that Defendants' use of an emblem and Defendants' Policy # 424, as applied to a mural, violate the Establishment Clause of the First Amendment.[8]

3.   The Religion Clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  The First Amendment applies to "the States and their political subdivisions"

---

[8]This Court previously granted summary judgment, in Defendants' favor, as to Plaintiff's remaining claims.  (Mem. Op. & Order [Doc. 152] 1).

through the Fourteenth Amendment.  *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000).

4.    "The First Amendment contains no textual definition of 'establishment'"; the term is "not self-defining."  *McCreary County v. ACLU of Ky.*, 125 S. Ct. 2722, 2742 (2005).

5.    "Establishment Clause questions are heavily dependent on the specific context and content of the display."  *See O'Connor*, 416 F.3d at 1222 (citing *Van Orden v. Perry*, 125 S. Ct. 2854, 2869 (2005) (Breyer, J., concurring in the judgment)).  Resolving such claims is, necessarily, "fact-intensive."  *Van Orden*, 125 S. Ct. at 2869 (Breyer, J., concurring in the judgment).

6.    The "traditional standard" for Establishment Clause analysis is the three-part test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1258-59 (10th Cir. 2005) (internal quotation marks and citations omitted).  The *Lemon* test provides that "'government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement.'"  *O'Connor*, 416 F.3d at 1224 (quoting *Bauchman v. W. High Sch.*, 132 F.3d 542, 551 (10th Cir. 1997)).

7.    In *Lynch v. Donnelly*, Justice O'Connor crafted a concurring opinion in which she "refine[d] the *Lemon* analysis to focus more on whether the government is 'endorsing' religion."  *Bauchman*, 132 F.3d at 551 (citing *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984)).  Justice O'Connor's "endorsement test" has proven to be a sound analytical framework for evaluating governmental use of religious symbols. *See O'Connor*, 416 F.3d at 1224; *see e.g.*,

12

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 (1989) (employing "endorsement test" in analyzing holiday display featuring crèche and Chanukah menorah).

8.   The "endorsement test" provides that the "'government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred.'" *O'Connor*, 416 F.3d at 1224 (quoting *Bauchman*, 132 F.3d at 551).

   a.   Purpose probes "whether the government's *actual* purpose is to endorse or disapprove of religion." *O'Connor*, 416 F.3d at 1224 (emphasis added) (quoting *Bauchman*, 132 F.3d at 551).

   b.   Effect considers "whether a reasonable observer aware of the history and context" underlying a particular claim would conclude that it "had the effect of favoring or disfavoring a certain religion." *See id*. at 1227-28 (citing *Bauchman*, 132 F.3d at 551-52).

   c.   Both the purpose and effect prongs are analyzed through the eyes of an "objective observer." *McCreary County*, 125 S. Ct. at 2734; *see also O'Connor*, 416 F.3d at 1228. An objective observer "takes account of the traditional external signs that show up in the 'text, legislative history, and implementation . . .' or comparable official act." *McCreary County*, 125 S. Ct. at 2734 (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308). The objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *Id.* at 2737 (citing *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308).

13

d.    The identity of the "reasonable observer" - "whose perceptions determine whether the government acts with a purpose and effect that violates the Establishment Clause" - is critical. *See Skoros v. City of New York*, 437 F.3d 1, 23 (2d Cir. 2006); *O'Connor*, 416 F.3d at 1227-28. Where, as here, an Establishment Clause challenge arises out of the elementary and primary school context, "special concerns arise in the identification of a reasonable observer." *See Skoros*, 437 F.3d at 30. Notwithstanding the fact that Plaintiff's claims arise out of the public schools setting, however, it is clear that the reasonable observer is an adult: "young schoolchildren cannot satisfy the[] requirements" of the Supreme Court's reasonable observer. *See id.* at 24. As such, the Court casts an adult in this role "who, in taking full account of the policy's text, history, and implementation, does so mindful that" the challenged practices arise in the primary and secondary public school context. *See id.* at 23; *see also O'Connor*, 426 F.3d at 1228 ("reasonable observer" profiled as having broad and significant familiarity with the content and context, including the history and implementation, of the challenged practice).

e.    Entanglement, "*Lemon*'s final prong," mandates "that a challenged governmental action 'must not foster an *excessive* government entanglement with religion.'" *Utah Gospel Mission*, 425 F.3d at 1261 (emphasis added) (quoting *Lemon*, 403 U.S. at 613). Contacts between the government and religion are only impermissible if they are so extensive that they have "the effect of advancing or inhibiting religion." *Agostini v. Felton,* 521 U.S. 203, 233 (1997).

9.    While the Supreme Court's plurality opinion in *Van Orden* upheld a Ten Commandments

14

display without mentioning the *Lemon* factors or the endorsement test, *Van Orden*, 125 S. Ct. at 2858-64 (plurality opinion), the high court has not overruled *Lemon* and "it remains binding law." *O'Connor*, 416 F.3d at 1224. Indeed, post-*McCreary County* and *Van Orden*, the Tenth Circuit has continued to apply the *Lemon* factors, as modified by the endorsement test. *See id.*

10.     The Latin cross - like the Ten Commandments at issue in *McCreary County* and *Van Orden* - is undeniably religious. *McCreary County*, 125 S. Ct. at 2738; *Van Orden*, 125 S. Ct. at 2863 (plurality opinion); *accord Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 771 (1995) (Thomas, J., concurring) (recognizing the cross as "one of the most sacred of religious symbols"); *Friedman v. Bd. of County Comm'rs of Bernalillo County*, 781 F.2d 777, 782 (10th Cir. 1985) (en banc) ("The religious significance of the cross . . . is undisputed.").

11.     In this case, therefore, the crosses incorporated in the emblem and the mural have obvious "religious significance." *Van Orden*, 125 S. Ct. at 2863 (plurality opinion); *accord Robinson v. City of Edmond*, 68 F.3d 1226, 1231 n.9 (10th Cir. 1995) (recognizing that "a Latin cross" is "a very familiar religious symbol").

12.     At the same time, religious symbols can have both religious *and* secular meaning. *Van Orden*, 125 S. Ct. at 2863 (plurality opinion).

13.     To prevail, Plaintiff must evidence that Defendants' use of an emblem and Policy # 424, as applied to the emblem and a mural, constitute Establishment Clause violations. *See Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002); *see also Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 300 (5th Cir. 1999) ("plaintiffs bear the burden of proof on

. . their Establishment Clause claim").  For the reasons that follow, Plaintiff failed to meet this burden.

**A.     Maintenance-Vehicle Emblem.**

14.     Plaintiff did not prove that the maintenance-vehicle emblem lacks a genuine, secular purpose.

a.     There is no evidence that the emblem's adoption, or its continued use,  was motivated by Defendants' desire to endorse or advance Christianity.  *See O'Connor*, 416 F.3d at 1225 (quoting *McCreary County*, 125 S. Ct. at 2733).

b.     Making LCPS maintenance vehicles readily identifiable is a legitimate, secular purpose.  *See, e.g.*, *Friedman*, 781 F.2d at 780 n.3 (declining to "explicitly reject" the defendant's stated secular purpose for the challenged city seal, namely: "county identification").

c.     While Defendants' research was not as exhaustive as the Court would have expected, there is no historical evidence that suggests that anything other than Defendants' stated secular purpose precipitated the emblem's adoption and its continued use.

d.     The lack of more detailed information "does not mean . . . that the government fails the purpose prong in cases in which there is no available evidence of the original intent for adopting a practice."  *King v. Richmond Co.*, 331 F.3d 1271, 1277 (11th Cir. 2003); *accord McCreary County*, 125 S. Ct. at 2735 (noting that "Establishment Clause analysis does not look to the veiled psyche of government officers" and that, if government actors' religious motive is not apparent to the objective observer, then, "without something more," the "government does not make a divisive announcement that in itself amounts to taking religious sides").  In any event, when there is no

16

evidence of the original purpose for adopting a practice, the government may propose possible secular justifications for the challenged practice. *King*, 331 F.3d at 1277.

15. Plaintiff did not prove that the emblem has the primary effect of endorsing religion.

a. The endorsement test's "effect" analysis probes "whether, irrespective of the government's actual purpose," the challenged display "conveys a message of endorsement." *Lynch*, 465 U.S. at 690, *quoted in Foremaster v. City of St. George*, 882 F.2d 1485, 1491 (10th Cir. 1989). Effect is a "question of law" for the Court, which is determined "without reference to the reactions of individual viewers." *O'Connor*, 416 F.3d at 1231 n.7 (citing *Bauchman*, 132 F.3d at 555); *accord Capitol Square Review & Advisory Bd.*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) (explaining that the reasonable observer standard does not ask whether "a particular viewer of a display might feel uncomfortable").

b. A reasonable observer of the emblem affixed to LCPS maintenance vehicles would understand the crosses incorporated therein to symbolically represent Las Cruces - a uniquely named geopolitical subdivision - rather than an endorsement of Christianity.

i. While Latin crosses have obvious and profound religious significance, in Las Cruces they have both religious and secular meaning. *See supra* Conclusions of Law 10-12.

ii. Las Cruces' name distinguishes this case from a number of cases in which government seals or logos incorporating the Latin cross have been struck down as unconstitutional. *E.g.*, *Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995); *Friedman*, 781 F.2d 777 (10th Cir. 1985); *Harris v. City of*

*Zion*, 927 F.2d 1401 (7th Cir. 1991); *Webb v. City of Republic*, 55 F. Supp. 2d 994 (W.D. Mo. 1999); *ACLU of Ohio v. City of Stow*, 29 F. Supp. 2d 845 (N.D. Ohio 1998).  Unlike the instant matter, the local governing bodies in those cases necessarily made choices unrelated to the name of the entity itself in selecting symbols (or seals) to represent their city or county.  In their decision-making, the governing bodies revealed attitudes and beliefs which impermissibly crossed the establishment line.

iii.   Las Cruces' name makes this case more analogous to *Murray v. City of Austin* where the Court of Appeals for the Fifth Circuit upheld the City of Austin, Texas' official logo, notwithstanding its inclusion of a Latin cross. *Murray v. City of Austin*, 947 F.2d 147 (5th Cir. 1991).  As in *Murray* - where the "connection between the state of Texas, the city of Austin, and Stephen F. Austin" was readily apparent and beyond dispute - the link between Las Cruces and three crosses is "unparalleled."  *See Webb*, 55 F. Supp. 2d at 1000 (construing *Murray*); *accord Robinson*, 68 F.3d at 1232 (same).  Further, in both *Murray* and this case, the name of the city drove the adoption of the contested symbol that, symbolically, reflects that name.

c.   A reasonable observer - that is, "the average receiver of the government communication or average observer of the government action," *Robinson*, 68 F.3d at 1230 (internal quotation marks and citations omitted) - would not find that the emblem's "particular physical setting" had the effect of endorsing religion. *O'Connor*, 416 F.3d at 1228 (citing *Lynch*, 465 U.S. at 671, 681-82, 685).

i.      The most prominent aspect of the emblem's design is the text that reads "Las Cruces Public Schools" due to its large size.

ii.     The crosses incorporated in the emblem are quite small.  *Cf. Robinson*, 68 F.3d at 1232 (noting that, "[l]ike Bernalillo County's seal [at issue in *Friedman*], and the seals of Zion and Rolling Meadows [at issue in *Harris*], the cross is a prominent feature of the Edmond seal."); *id.* at 1233 (rejecting - where no obvious connection between the city's name and the Latin cross existed - the notion that the religious message conveyed by a cross incorporated in a city seal was "neutralized" by presence of secular imagery); *Harris*, 927 F.2d at 1412 (same).

iii.    The emblem itself makes it clear that the vehicles to which it is affixed are publically owned.  *Cf. Bauchman*, 132 F.3d at 555 (finding that a reasonable observer would be aware that "the Choir represents one of Salt Lake City's *public* high schools and is comprised of a diverse group of students" (emphasis added)).  In Las Cruces, a reasonable observer would find this pivotal to the meaning of the crosses incorporated in the emblem.

iv.     The crosses' mere presence does not, per se, undermine the emblem's constitutionality.  The emblem's legality does not turn on how Plaintiff personally perceives the emblem; the constitutional yardstick is the reasonable observer.  Again, the Court emphasizes that there is no evidence of "'coercive pressure' imposed" by the emblem on the LCPS community.  *Summum*, 297 F.3d at 1010 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98,

100 (2001)).

d.    A reasonable observer would not find that the emblem "pervades the daily lives" of Las Cruces residents.  *See Robinson*, 68 F.3d at 1231 (internal quotation marks and citation omitted).

    i.    Unlike government seals previously struck down by the Tenth Circuit and other courts of appeal, the LCPS emblem does not "appear[] on all [LCPS] paper work, on all [LCPS] vehicles, [and] . . . [LCPS personnel] uniforms." *See id.* at 782.  This factor weighs against "a finding of state endorsement." *See O'Connor*, 416 F.3d at 1228.

    ii.    Although the emblem is permanently affixed to LCPS' thirty-five maintenance vehicles, which travel between LCPS properties, the vehicles are not so great in number that a reasonable observer would find the emblem pervasive in Las Cruces.  *Cf. Murray*, 947 F.2d at 150 (upholding seal containing cross where the challenged insignia was "used on police cars and other city vehicles, letterhead, monthly utility bills, uniforms of city employees, including police and firefighters, on the wall of the city council chambers, and on or in many city-owned buildings, parks, and recreation centers.").

    iii.    A reasonable observer would find it material that school children's exposure to the emblem is limited.  *Cf. Stone v. Graham*, 449 U.S. 39, 42 (1980) (striking down Kentucky statute requiring the display of the Ten Commandments in each public classroom statewide).

e.    These facts and conclusions, taken together, would "lead the reasonable observer to

conclude that the state did not intend to endorse a particular religious message."[9] *O'Connor*, 416 F.3d at 1229 (citations omitted); *see generally Van Orden*, 125 S. Ct. at 2876 (Stevens, J., dissenting) (recognizing that "a religious symbol may at times become an important feature of a familiar landscape or a reminder of an important event in the history of a community."). Nor would a reasonable observer perceive the emblem to be a state-sponsored endorsement of Christianity. *See O'Connor*, 416 F.3d at 1231; *Bauchman*, 132 F.3d at 555 (endorsement test requires plaintiff to "allege facts indicating" the challenged practices "have a *principle* or *primary* effect of advancing or endorsing religion" (emphasis in original)).

16.     Plaintiff did not prove that the emblem fosters excessive government entanglement.

    a.     The Tenth Circuit has noted that "[*Lemon*'s] entanglement analysis typically is applied to circumstances in which the state is involving itself with a recognized religious activity or institution." *Bauchman*, 132 F.3d at 556.

    b.     There is simply no evidence indicating any involvement between Defendants and any religious activity or entity in relation to the selection or continued use of the emblem on LCPS maintenance vehicles. *See id.*

    c.     As such, and having concluded that the emblem survives the endorsement test, *see supra* Conclusions of Law 14-15, the Court concludes that a reasonable observer would also find the selection and display of the emblem amount to "religiously

---

[9]Plaintiff's insistence that the fact that the emblem is encountered by elementary and secondary school students on LCPS grounds does not undermine this conclusion. The Tenth Circuit is clear that the "Establishment Clause . . . does not compel the removal of religious themes from public education." *O'Connor*, 416 F.3d at 1230; *accord Bauchman*, 132 F.3d at 555 ("United States Supreme Court precedent 'plainly contemplate[s] that on occasion some advancement of religion will result from governmental action.'" (quoting *Lynch*, 465 U.S. at 683)).

neutral" choices. *See Bauchman*, 132 F.3d at 556.

17. Accordingly, Plaintiff did not prove that LCPS' maintenance-vehicle emblem violates the Establishment Clause. A reasonable observer would "perceive [Defendants] to be acting neutrally" toward religion in its use of the maintenance-vehicle emblem. *See Utah Gospel Mission*, 425 F.3d at 1260 (internal quotation marks and citation omitted); s*ee generally Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 476 (2d Cir. 1999) (recognizing that the Supreme Court's jurisprudence dictates that: "when courts adjudicate claims that some governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance"); *Ams. United for Separation of Church & State*, 980 F.2d 1538, 1544 (6th Cir. 1992) (en banc) (upholding private, seasonal display of menorah in public forum) ("Even if this display appears similar in some respects to others that have been found unconstitutional in the past, other factors, unique to this case, may *require* us to uphold the [defendant's] decision" (emphasis added)).

 **B. Policy # 424.**

18. The Supreme Court, in addressing Establishment Clause challenges to public school policies involving religion, has "consistently held" that the government does not violate the Establishment Clause by "enact[ing] neutral policies that happen to benefit religion." *Capitol Square Review & Advisory Bd*, 515 U.S. at 764 (plurality opinion) (citations omitted); *id*. at 768 (citations omitted) ("policies providing incidental benefits to religion do not contravene the Establishment Clause").

19. This principle extends with equal force to public schools. *Bauchman*, 132 F.3d at 554 (citing

*Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963), and *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1315-16 (8th Cir. 1980)).

20.   This Court has previously found that Policy # 424 is, consistent with Supreme Court and Tenth Circuit precedent, a facially neutral policy.  (Mem. Op. & Order [Doc. 152] 55-57.)

21.   Yet, because "'[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so,'" *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302 (quoting *Lee v. Weisman*, 505 U.S. 577, 587 (1992)), it is not enough for Policy # 424 to be facially constitutional; it must also be constitutional in its application.

### 1.   Policy # 424, as applied to the maintenance-vehicle emblem.

22.   For the reasons stated above, the Court concludes that Policy # 424 is constitutional as applied to the maintenance-vehicle emblem.  *See supra* Conclusions of Law 14-17.

### 2.   Policy # 424, as applied to the Booker T. Elementary mural.

23.   For the reasons that follow, the Court concludes that Policy # 424 is constitutional as applied to the BTW mural.  The artwork does not constitute a violation of Policy # 424.

24.   Plaintiff did not prove that the mural lacks a genuine, secular purpose.

   a.   Defendants' stated secular purpose in displaying the mural was to provide educational assistance to students enrolled in the CYC after-school program, which provides "latch-key" children with an educational environment after school and on weekends.

   b.   Providing arts-based educational opportunities to students is patently a secular purpose.  *See Bauchman*, 132 F.3d at 552-53; *see generally Fleming v. Jefferson*

23

*County Sch. Dist. R-1*, 298 F.3d 918, 926 (10th Cir. 2002) (Free Speech and Free Exercise challenge) (noting, generally, "the deference to be accorded to school administrators about pedagogical interests").

c.   Defendants' proffered purpose is genuine.  *O'Connor*, 416 F.3d at 1225 (quoting *McCreary County*, 125 S. Ct. at 2733).

d.   In *O'Connor*, the Tenth Circuit made clear that the "purpose prong of the endorsement test focuses on the intent of the government actor in displaying a particular work of art, not on the intent of the artist in creating the work." *O'Connor*, 416 F.3d at 1225 n.3 (citation omitted).  This is especially true where, as here, the artists were primary school students.

e.   In any case, while young children are undoubtedly impressionable, Wolverton did not direct, or otherwise coerce, the students to draw or include three crosses in the mural. *Bauchman*, 132 F.3d at 553 (declining to "infer an impermissible purpose or effect in the absence of any supporting factual allegations").

f.   The multiple layers of oversight - both on sight at BTW and by LCPS Administrator Schutz - further corroborate the genuineness of Defendants' position that the mural's design originated with the children and the mural's purpose was to provide an arts-based educational experience for the students involved.

g.   Having examined the mural's available history exhaustively, the Court concludes that the mural was created by BTW students, and that the mural was created for a secular purpose.

24

25.     Plaintiff did not prove that the mural's creation or display has the primary effect of endorsing religion.

a.     As previously noted, the "effect" analysis probes "whether, irrespective of the government's actual purpose," the challenged display "conveys a message of endorsement." *Lynch*, 465 U.S. at 690, *quoted in Foremaster*, 882 F.2d at 1491.

b.     Government-sponsored artwork that incorporates a religious symbol does not necessarily convey "'a message of *endorsement* or disapproval.'" *Skoros*, 437 F.3d at 47 (emphasis added) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)); *accord Van Orden*, 125 S. Ct. at 2863 (plurality opinion); *cf. O'Connor*, 416 F.3d at 1228 (challenged artwork, "one of thirty outdoor sculptures," was displayed as "part of a 'typical museum setting'"); *see generally Good News Club*, 533 U.S. at 114 ("[T]he guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." (internal quotation marks and citation omitted)); *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 251 (1990) (secondary school) ("[T]here is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate.").

c.     The mural's creation does not offend or violate Policy # 424, because Policy # 424 permits religious symbols to "be displayed . . . provided no effort is made to impose any particular beliefs which may be associated with such symbols." *See supra* Finding of Fact 45.

d.  A reasonable observer of the mural - "aware of the history and context" of the forum - would understand the crosses incorporated in the artwork symbolically represent this uniquely named geopolitical subdivision, rather than an endorsement of Christianity. *See Bauchman*, 132 F.3d at 551, 560.

    i.  Three crosses have both religious and secular meaning in Las Cruces. *See supra* Conclusions of Law 15(b).

    ii.  Las Cruces' name distinguishes this case from a number of cases in which government seals or logos incorporating the Latin cross have been struck down as unconstitutional. *See supra* Conclusion of Law 15(b)(ii).

    iii.  Las Cruces' name makes this case more analogous to *Murray v. City of Austin* where the Court of Appeals for the Fifth Circuit upheld the City of Austin, Texas' official logo, notwithstanding its inclusion of a Latin cross. *See supra* Conclusion of Law 15(b)(iii).

    iv.  The mural is clearly student artwork and all of the images depicted obviously reflect either the Las Cruces community or BTW.

e.  A reasonable observer would not find that the mural's design had the effect of endorsing religion.

    i.  A reasonable observer of the mural would be aware that: (1) the mural is a piece of artwork that students in the Court Youth Center's Safe After School Program created, with the help of Wolverton; (2) school officials were not actively involved in the project, other than to provide oversight; (3) the mural is accompanied by a commemorative plaque that reads "Booker T.

26

Washington" and explains that the mural was funded by the DOE's 21st Century Community Learning Centers program; (4) the mural includes three center panels that feature images - the chiles and chile fields, three crosses, and yucca, respectively - which are commonly identified with, and widely familiar to residents of, the Las Cruces area, including primary school students.

ii.     A reasonable observer of the mural would also be aware that: (1) although the crosses depicted in the mural are centered, they appear in front of, what appear to be, the Organ Mountains and are accompanied by various other images commonly associated with the Las Cruces area; and (2) the mural is "book ended" by, what appears to be a student on the far left and, on the far right, a drawing of Booker T. Washington, BTW's namesake.

iii.    Notwithstanding its large scale, because the mural incorporates images indicative of BTW's students, BTW's namesake, and surrounding community, a reasonable observer would not perceive the mural to endorse religion. The fact that the mural is displayed at BTW, a *public* school, is pivotal to the crosses' meaning and, thus, the mural's effect.

iv.     Viewed in this context, the BTW mural's design and physical setting, "though not neutralizing the religious content of . . . [the crosses], negates any message of endorsement of that content." *See O'Connor*, 416 F.3d at 1228 (quoting *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring)).

f.      A reasonable observer would not find that the mural's "particular physical setting"

27

had the effect of endorsing religion. *O'Connor*, 416 F.3d at 1228 (citing *Lynch*, 465 U.S. at 671, 681-82, 685) (upholding prominently placed statue that was part of "museum setting."). The fact that the mural is not accompanied by other artwork does not demand a contrary conclusion. *Cf. O'Connor*, 416 F.3d at 1229 n.5 ("Courts that have held particular works of art to violate the Establishment Clause have tended to focus on the relative isolation of the challenged work from other government-sponsored displays." (citations omitted)). Unlike instances in which courts of appeal have found that this factor triggered an Establishment Clause violation, here, the crosses incorporated in the BTW mural are part of a collage of images that are associated with Las Cruces, making it clear to the reasonable observer that the crosses symbolize the name Las Cruces. *Cf. Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 681, 683-84 (6th Cir.1994) (holding that a portrait of Christ in a public school violated the Establishment Clause when it was "not part of a group of paintings"); *Joki v. Bd. of Educ.*, 745 F. Supp. 823, 831 (N.D.N.Y.1990) ("[T]his is not a case where the school displays the painting as part of a student art exhibit."), *cited in O'Connor*, 416 F.3d at 1229 n.5; *see also Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 495 (7th Cir. 2000) (finding that a fifteen-foot statue of Jesus Christ, erected in a public park, violated the Establishment Clause where the park "expressed only one message, which is the religious message conveyed by the statue," it "was created to display the statue, and the City present[ed] no evidence that other groups have ever used the park to present alternative messages").

26.   Plaintiff did not prove that the mural's creation or display fosters excessive government entanglement.

     a.   There is no evidence that Defendants had any involvement with any religious activity or entity in relation to the BTW mural's creation or display. *See Bauchman*, 132 F.3d at 556.

     b.   As such, and having concluded that the mural survives the endorsement test, *see supra* Conclusions of Law 24-25, the Court concludes that a reasonable observer would also find the creation, and continued display, of the mural to be "religiously neutral" choices. *See Bauchman*, 132 F.3d at 556.

27.   All of the foregoing, taken together, would "lead the reasonable observer to conclude that," in displaying the BTW mural, "the state did not intend to endorse a particular religious message."[10] *O'Connor*, 416 F.3d at 1229 (citations omitted).  A reasonable observer would perceive that the crosses incorporated therein symbolize the name Las Cruces. *See id*. at 1231; *Bauchman*, 132 F.3d at 555 (endorsement test requires plaintiff to "allege facts indicating" the challenged practices "have a *principle* or *primary* effect of advancing or endorsing religion" (emphasis in original)).

28.   The fact that the mural is on permanent display at BTW is not to the contrary.  First, again, there is no evidence of any efforts by Defendants or LCPS personnel to use the crosses incorporated in the mural to "impose" any Christian beliefs.  Second, reading Policy # 424, Section C as a whole, it is clear that, to the extent a conflict exists between Part 1 and Part 3, Part 1 controls.  Because the mural comports with Part 1, the mural does not violate Policy

---

[10]*See supra* note 9.

# 424, Section C.

29.   Policy # 424 is constitutional as applied to the BTW mural.  *See, e.g.*, *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 758-59 (7th Cir. 2001) (Posner, J.) ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself . . . . Academic freedom and states' rights, alike demand deference to educational judgments that are not invidious" (internal quotation marks and citations omitted)).

30.   Any proposed Finding of Fact or Conclusion of Law, submitted by the parties, inconsistent herewith is denied.

31.   Having considered Plaintiff's "Motion to Alter or Amend per F.C.P.R. [sic] 59(e) Memorandum Opinion and Order (Doc. 152)" (Doc. 158), Plaintiff's "Motion to Amend" (Doc. 161), and Defendants' "Motion to Strike Plaintiff's Motion to Alter or Amend Per F.C.P.R. Rule 59(e) Memorandum Opinion and Order (Doc. 152)" (Doc. 159), the Court concludes that all three motions will be denied.

   a.   The Court's November 9, 2006 Memorandum Opinion and Order "was obviously not a final judgment"; Plaintiff's Rule 59(e) motion is, thus, a premature motion to reconsider. *See Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991); *see also* Fed. R. Civ. P. 54(b).

   b.   The Court, nevertheless, will treat Plaintiff's motion - here, erroneously termed a "Rule 59(e)" motion - "as an effective Rule 59(e) motion" upon the entry of final judgment in a case. *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1272

(10th Cir. 2001) (citing *Hilst v. Bowen*, 874 F.2d 725, 726 (10th Cir. 1989) (per curiam) ("Although Rule 59 motions are to be served not later than ten days after entry of judgment, courts and commentators generally agree that this ten-day limit sets only a maximum period and does not preclude a party from making a Rule 59 motion before a formal judgment has been entered.")).

c.   The "limited grounds [that] support a Rule 59(e) motion" include: (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. *Schlussler-Womack v. Chickasaw Tech. Prods. Inc.*, 116 F. App'x 950, 954 (10th Cir. 2004) (citing *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1186 n.5 (10th Cir. 2000), and *Brumark Corp. v. Samson Res. Corp.*, 57 F. 3d 941, 948 (10th Cir. 1995)).

d.   Plaintiff advances no grounds that warrant reconsideration.

e.   Accordingly, Plaintiff's motions will be denied; Defendants' motion will be denied as moot.

## IV.   Conclusion.

Based upon the foregoing,

**IT IS ORDERED** that the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff's claim for relief based on violations of the Establishment Clause of the First Amendment.

**IT IS ORDERED** that Defendants shall file a statement of their attorneys' fees within thirty (30) days hereof.  Finally,

**IT IS ORDERED** that all other pending motions be **DENIED** as moot.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**